2003 ME 31

**STATE of Maine**

v.

**Nicholas IRVING.**

Supreme Judicial Court of Maine.

Argued: Dec. 11, 2002.
Decided: March 7, 2003.

Evert N. Fowle, District Attorney, Alan P. Kelley, Deputy Dist. Atty. (orally), Skowhegan, for State.

John Alsop, (orally), Alsop, Mohlar & Ketterer, Norridgewock, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] Nicholas Irving appeals from a judgment of conviction of manslaughter (Class A), 17–A M.R.S.A. § 203(1)(A) (Supp.2002), entered after a jury trial in Superior Court (Somerset, *Marden, J.*).[1] The victim, Gary Massey, who was a passenger in Irving's vehicle, died when the vehicle left the road and crashed into a tree. Irving argues that the court erred in (1) admitting the testimony of two State experts on the speed of Irving's car; (2) allowing evidence of Irving's use of a seat belt; and (3) allowing the State to show the victim's photograph to the jury during its opening. We disagree with Irving's contentions, and we affirm the judgment.

## I. BACKGROUND

[¶ 2] In the afternoon of October 27, 1999, Irving drove from Lawrence High School with his classmate Massey in the passenger seat. Irving lost control of his car on the Lower Ridge Road in Fairfield at a point where the posted speed limit was thirty-five miles per hour. The car left the road, went over an area of field

---

1. The court sentenced Irving to twelve years imprisonment, suspending all but thirty months, and six years probation with numer- ous conditions. Irving's request to appeal his sentence was denied.

and lawn, and became airborne. The car hit a tree, and the impact broke it into two pieces. Massey died when he was thrown from the car. Irving, who was wearing a seat belt, suffered internal injuries.

[¶ 3] Irving was charged with manslaughter. The State's theory was that Irving operated his car with excessive speed. At trial Irving stipulated that he had been driving the car and that the crash caused Massey's death.

[¶ 4] Irving moved in limine to exclude certain evidence including the photograph of the victim and the opinions of the State's experts on the speed of Irving's vehicle. Concerning the photograph, the court ruled that the State could show it to the jury during its opening statement as an illustrative aid but that the photograph would not be admitted into evidence. With regard to the expert evidence, the issue became whether the experts' opinions were based upon reliable and accepted procedures for reconstructing the speed of a vehicle after an accident. The court concluded that the proposed testimony of the experts met the requirements of M.R. Evid. 702 and denied Irving's request for exclusion. The motion and voir dire testimony of the experts was a shorter version of their trial testimony.

[¶ 5] At trial Trooper James Wright testified to his qualifications to reconstruct a motor vehicle accident. He described his mapping of the accident scene and location of various skid marks and scuff marks. He testified that a critical speed scuff is a scuff mark of a rolling tire made when the vehicle has reached a speed on a curve where the tires sideslip and the rear tires have crossed over the track of the front tires. He identified critical speed scuff marks on the field and lawn of the accident scene; he measured the curvature of the scuff marks; he described how he determined the coefficient of friction of the sur-face; and he utilized the critical speed scuff formula to assess the speed of Irving's vehicle immediately prior to the point it became airborne. He then applied a minimum speed formula utilizing other scuff marks on the road to calculate the minimum speed the car was going at the time it left the road. He testified that in his opinion the minimum speed of Irving's vehicle was seventy-three miles per hour.

[¶ 6] Another State Police Officer, Sergeant McAlister, who oversaw all training and certification of law enforcement officers in accident reconstruction in Maine, testified that the critical speed scuff formula is used throughout the country. In his opinion the method could be performed on any surface on which a critical speed scuff could be identified.

[¶ 7] Albert Godfrey, a forensic engineer, testified that he had reviewed Trooper Wright's accident reconstruction report. He agreed with Wright's assessment of the seventy-three miles per hour minimum speed of Irving's car, but in addition he utilized a mark that Wright had not used, which increased the minimum speed to seventy-five miles per hour at the time the car left the road. Godfrey testified that he also performed a maximum speed analysis, utilizing other information that had been documented by Wright. Godfrey determined that the maximum speed the vehicle could have been going at the time it left the road was 103 miles per hour. In arriving at the maximum speed Godfrey identified critical speed scuffs on the road which Wright had not identified as critical speed scuffs because of lack of evidence of crossover and because of evidence of braking. Godfrey testified that crossover was not an essential factor in determining whether a scuff was a critical speed scuff. Godfrey lowered the estimate of maximum speed from 103 to 100 miles per hour because of

the presence of a braking mark at the end of the critical speed scuff mark.

[¶ 8] Irving's expert witness, Thomas Bohan, a forensic physicist, testified that the critical speed scuff formula utilized by Trooper Wright is an accepted means of determining the speed of a vehicle under certain conditions: that is, the presence of a scuff mark of a rolling tire on pavement with a clear indication of side slipping and no significant braking. He testified that pavement is the best surface for identifying a critical speed scuff mark, but a snow-covered roadway would also suffice. While an indication of crossover, which is the back wheels tracking outside of the front wheels, is highly desirable, it is not essential. He was critical of attempts to determine the coefficient of friction, a necessary step in the critical speed scuff formula, on surfaces other than pavement. His primary criticism of using scuff marks on grass to perform the critical speed scuff analysis appeared to be the lack of scientific testing and publication on the subject. Bohan opined that the scuff marks on the roadway, utilized by Godfrey, were not critical speed scuff marks because of the absence of crossover. He testified that the use of scuff marks on grass was unorthodox.[2]

[¶ 9] Over Irving's objection and after voir dire, the court allowed a classmate to testify that he and Irving were good friends, that he had been a passenger in Irving's car numerous times, and that it was uncommon for Irving to wear a seat belt. The classmate had been surprised to learn that Irving was wearing a seat belt at the time of the October 27 accident.

## II. EXPERT TESTIMONY

[¶ 10] Irving argues that the court erred in allowing Trooper Wright to testify as to his opinion of the speed of Irving's vehicle because Wright based his opinion on scuff marks on grass. Irving contends that the use of grass scuff marks to calculate speed is not a sufficiently reliable method.

[¶ 11] The admissibility of expert evidence is set forth in M.R. Evid. 702: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In *State v. Williams*, 388 A.2d 500, 504 (Me.1978), we stated:

> The controlling criteria regarding the admissibility of expert testimony, so long as the proffered expert is qualified and probative value is not substantially outweighed by the factors mentioned in Rule 403, are whether in the sound judgment of the presiding Justice the testimony to be given is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue.

In *Williams*, we found that the science was sufficiently reliable to be relevant.[3] *Id.* at 505.

2. Another issue in this case arose during the motion hearing. The State had hired a physicist, Michael Corson, to review Wright's speed analysis, but after receiving Corson's report, the State decided not to call him to testify. Because the report was critical of Wright's analysis, Irving sought to introduce the report at the motion hearing, asserting that it was consistent with the testimony of Irving's expert. The State objected on hearsay grounds, and the court sustained the objection. Although Irving now seeks to appeal that ruling, Corson's report was never made a part of the record on appeal nor was there an offer of proof as to its contents. For this reason, Irving has failed to preserve this issue for review.

3. The parties framed their arguments on the issue of expert evidence on the basis of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

[¶ 12] The State established that Wright was qualified by his training and experience to use scientific and technical knowledge, assuming it was reliable, which would assist the jury in determining whether Irving's car was speeding, a fact in issue. The relevancy of Wright's testimony, however, was dependent upon the reliability of his method and science. If an expert's methodology or science is unreliable, then the expert's opinion has no probative value.

[¶ 13] In a motor vehicle manslaughter case involving an allegation of dangerous speed, we acknowledged that Rule 702 encompasses expert testimony regarding automobile accident reconstruction. *State v. Boutilier*, 426 A.2d 876, 878 (Me.1981). In *Boutilier*, we emphasized that the "requisite to the admissibility of proffered expert testimony is a showing of *sufficient reliability* to satisfy the evidentiary requirements of relevance and helpfulness, and of avoidance of prejudice to [a party] or confusion of the fact-finder." *Id.* at 879. In *Boutilier*, we questioned the meager qualifications of the expert, but we vacated the judgment because of the lack of evidence tending to show that the expert's method of calculating the vehicle's speed was reliable.[4] *See id.*

[¶ 14] This case differs from *Boutilier*. First, there is no question as to Wright's qualifications. Secondly, three other experts, including Irving's expert, acknowledged the reliability of the critical speed scuff analysis. The only issue in this case was whether the methodology was limited to pavement surfaces or could be used with grass scuff marks. With three qualified experts stating that the critical speed scuff analysis could be performed with grass scuff marks, we cannot say that the court exceeded its discretion in determining that the method used by Wright was sufficiently reliable to be relevant to the issue of speed. Given the evidence before it, it was not error for the court to determine that the application of the critical speed scuff analysis to the grass scuff marks went to the weight of the evidence and therefore to allow the jury to hear how the analysis was done as well as the criticism of the method. The court did not err in admitting Wright's opinion of speed.

[¶ 15] The legal analysis is similar with regard to Godfrey's testimony. Insofar as Irving sought to exclude that portion of Godfrey's testimony in which he approved of Wright's methodology, we conclude that the court did not abuse its discretion in allowing Godfrey's opinion. Irving, however, had a further objection to Godfrey's testimony and that concerned the maximum speed analysis which Godfrey based on a scuff mark without a sign of crossover and with evidence of braking. Although Wright testified to the necessity of crossover before a scuff mark could be identified as a critical speed scuff mark, Godfrey was of the opinion that crossover was not always required. Irving argues to

---

(1993). That case interpreted the federal rule on expert evidence, Fed.R. Evid. 702, and requires the trial court to consider whether the science can be or has been tested; whether it has been subjected to peer review and publication; whether it has a known or potential rate of error; and whether it has been generally accepted. *Daubert*, 509 U.S. at 592–95, 113 S.Ct. 2786. We need not address whether to adopt the *Daubert* standards be-

cause the interpretation of M.R. Evid. 702 in *Williams* is sufficient to guide our analysis.

4. The expert, a state trooper, disregarded and disagreed with the method contained in his training manual and instead used a "theoretical speed tolerance" formula for which no evidence of reliability was offered. *Boutilier*, 426 A.2d at 879.

us that Godfrey's testimony is reminiscent of the testimony of the expert in *Boutilier*.

[¶ 16] Unlike *Boutilier*, there is no issue of Godfrey's qualifications, and unlike *Boutilier*, Godfrey was not testifying to a method without any scientific support. Godfrey testified on voir dire that in his experience law enforcement officers only calculate minimum speeds, but that it was not uncommon for his profession to determine maximum speeds as well as minimum speeds. He testified that crossover was desirable but not essential and that, in his opinion, a long scuff mark left on the pavement by the Irving car was a critical speed scuff mark even though it had been rejected by Wright because it did not contain evidence of crossover and did show braking. Godfrey testified that he took the braking into consideration in his calculation and lowered the maximum speed from 103 to 100 miles per hour because of it.

[¶ 17] The admissibility of Godfrey's testimony presents a closer question than Wright's testimony because it is less coherent and because the court indicated its dissatisfaction with the lack of consistency between Godfrey's written report and his testimony.[5] Nonetheless, with the deference we give to the trial court's assessment of the witness and his explanation of his methodology, which the court obviously considered in the light of the other witness's testimony about the critical speed scuff method, we cannot conclude that it abused its discretion. Godfrey's methodology was sufficiently reliable to be relevant and admissible.

## III. SEAT BELT EVIDENCE

■ [¶ 18] Irving objected to the testimony of his classmate that it was uncommon for Irving to use a seat belt and that he was surprised when he heard that Irving had his seat belt fastened on this occasion. Irving argued that the evidence of his failure to use a seat belt on prior occasions was inadmissible evidence of prior bad acts. Assuming, without agreeing, that such evidence was of prior wrongs, it was inadmissible only to prove that the person acted in conformity with prior wrong acts. M.R. Evid. 404(b). Because the uncontested evidence was that Irving wore a seat belt on this occasion, there was no attempt to prove that he acted in conformity with his prior nonuse of a seat belt. Therefore, Rule 404(b) did not prohibit the classmate's testimony.

■ [¶ 19] Irving also objected on the ground that 29–A M.R.S.A. § 2081(5) (Supp.2002) prohibits evidence of nonuse of seat belts. The pertinent portion of the statute reads: "In an accident involving a motor vehicle, the nonuse of seat belts by the operator ... is not admissible in evidence in a civil or criminal trial, except in a trial for violation of this section." *Id.* We do not construe that statute to exclude evidence of *use* of a seat belt in a trial concerning an accident, nor do we think the statute can be construed to exclude evidence of prior nonuse of seat belts. The statute is concerned only with evidence of the nonuse of a seat belt in an accident when there is a trial involving that accident. Thus, the court did not err in allowing the classmate's testimony regarding Irving's seat belt.

## IV. PHOTOGRAPH OF THE DECEDENT

[¶ 20] The State originally indicated to the court that it intended to offer into

---

5. The report was not admitted into evidence and did not become part of the record on appeal.

evidence Massey's high school photograph. Irving's motion in limine sought to exclude the photograph. The court ruled that the State could show the jury the photograph during its opening statement, and Irving objected that the use of the photograph as a demonstrative aid during the opening was unduly prejudicial.

[¶ 21] The record on appeal contains very little information about the photograph except that it is described as a framed high school picture. Apparently it was placed on an easel in the courtroom. Because the opening statements were not transcribed, we do not know what mention was made of it. After opening statements a recess was taken, and the court and counsel attended to housekeeping matters, at which time Irving's counsel reported to the court that there was still controversy about the photograph. The court repeated its ruling that the photograph was an illustrative aid and was only to be shown to the jury during the State's opening. By agreement of the court and counsel, the State was allowed to return the photograph to the family.[6] Irving contends that the picture had no probative value and, to the extent that it had any, the probative value was outweighed by the danger of unfair prejudice.

[¶ 22] An illustrative aid is a depiction or object which illustrates testimony or argument. M.R. Evid. 616(a). It does not go into the jury room unless counsel agree or by order of the court for good cause. *Id.* 616(d). While it does not have to meet the requirements of admissibility, *id.* 616(a), it has to be related to the testimony or argument which it illuminates. When used to illustrate argument, the aid must not be used for an improper purpose just as an opening statement or closing argument cannot contain improper references. In *State v. Pineau,* 463 A.2d 779 (Me.1983), we affirmed an American Bar Association standard which provides:

> The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader that the guilt or innocence of the accused under the controlling law . . . .

*Id.* at 781 (quoting from AMERICAN BAR ASSOCIATION PROJECT ON STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO THE PROSECUTION FUNCTION § 5.8(d) (1971)). An illustrative aid used during argument that diverts a jury from the evidence or injects a risk of unfair prejudice would be improper.

[¶ 23] We have not been called upon to determine whether the use of a photograph of a victim, taken when the victim was alive, in a criminal trial concerning the victim's death is permissible.[7] With respect to photographs of the victim's body taken after death, we have ruled that even a gruesome photo may be admitted depending upon its probative value when weighed against the danger of unfair prejudice. *State v. Conner,* 434 A.2d 509, 512 (Me.1981).[8] We have upheld the admissi-

---

6. The State properly asked counsel for Irving whether he wanted the photograph retained for the record. *See* M.R. Evid. 616(e)(ii).

7. Some jurisdictions have found the use of a photograph of a deceased victim taken when the victim was alive to have little if any evidentiary value. *See, e.g., State v. Lafferty,* 749 P.2d 1239, 1258 (Utah 1988) (citing cases from other jurisdictions). A few jurisdictions have enacted statutes expressly regarding the photograph of a homicide victim. *See, e.g.,* N.J. STAT. ANN. §§ 2C:11–3(c)(6), 11–3a (2003); MASS. GEN. LAWS ANN. ch. 258B, § 3(v) (1988).

8. In *Conner,* we held that the probative value of a color photograph showing the victim's face "contorted by the agonies of a violent death," was "tenuous in the extreme." 434

bility of a photograph of a murder victim even when its probative value was minimal. *State v. Joy*, 452 A.2d 408, 413 (Me. 1982).

█ [¶ 24] Because there is no transcript of the State's opening statement, there is nothing in the record that demonstrates that the State did not relate its display of the photograph to its statement. Furthermore, on this record, neither an improper purpose for displaying the photograph nor a risk of unfair prejudice is apparent. Irving argues that the photograph risked sidetracking the jury into comparing the defendant and the victim, but nothing in this record supports that assertion. By allowing the State a narrowly restricted use of Massey's photograph, the court did not abuse its discretion. The court obviously retained control over the manner in which the State used the photograph and could have restricted its use further if the State's comments about it during the opening statement gave the court concern about improper use or unfair prejudice.

The entry is:

Judgment affirmed.

Concurring: SAUFLEY, C.J., and CLIFFORD, and LEVY, JJ.

LEVY, J., with whom SAUFLEY, C.J., and CLIFFORD, J. join, concurring.

[¶ 25] I join in the Court's opinion except on the question of the admission of the expert testimony of Albert Godfrey. Godfrey applied the algebraic equation for a critical speed scuff analysis to a 131–foot scuff mark and a 42–foot skid mark left on the road surface by Irving's car immediately before it left the road and entered a field. As noted by the Court, Godfrey's

decision to apply the formula to a scuff mark without any sign of crossover (crossover is exhibited when a rear tire scuff mark crosses over a tire scuff mark left by the corresponding front tire) and with evidence of braking was contrary to the expert opinion of the State's other expert witness, Trooper James Wright. It was also contrary to the opinion provided by the defendant's expert, Dr. Thomas Bohan, who testified that the formula should not be applied when there is evidence of braking.

[¶ 26] Serious questions were raised regarding the reliability of Godfrey's expert opinion in part because of his application of the critical speed scuff analysis under these circumstances, but also because his testimony was internally contradictory and, at times, difficult to comprehend. For example, considerable attention was paid to the conflict between Godfrey's pretrial report in which he wrote "that while the vehicle was traveling at a very high rate of speed, it probably was not traveling upwards of 100 miles an hour[,]" [9] and his voir dire testimony in which he testified "I can see the vehicle traveling upwards of a hundred miles per hour." In addition, Godfrey referred at different points of his testimony to 100 mph as representing the "minimum" speed and the "maximum" speed of Irving's vehicle.

[¶ 27] The preceding problems were compounded by a more fundamental problem associated with the scientific basis for Godfrey's opinion. He explained the algebraic formula that is employed in critical speed scuff analysis, which is derived from Newton's laws of physics: "To calculate

---

A.2d at 511–13. Although we emphasized the trial court's "wide range" of discretion in determining admissibility, we concluded that the danger of unfair prejudice substantially outweighed its probative value, but we found the error harmless. *Id.* at 512.

9. The report was not received in evidence; this excerpt from the report was stated on the record by the trial judge.

the speed, it is [3.86] times the square root of the radius of that scuff times the coefficient of friction plus or minus the super elevation of the roadway." He also explained that the multiple of 3.86 used to determine the "[m]inimum speed of a yaw mark ... was calculated from years of experimentation in the development of that formula." Godfrey offered no scientific basis, however, for his decision to reduce the 103 mph speed, derived from the formula, to 100 mph. He acknowledged that if a vehicle's brakes are being applied, the critical speed scuff analysis will produce a speed that is higher than the actual speed. He testified:

> Brakes can be applied without locking the wheels in a critical speed scuff and not negligibly change the—it will be slightly lower—or the speed will be slightly higher that it will give you. We know that at the end of it the wheel was locked up; therefore, I am being conservative by my hundred and three miles an hour, saying there in my third of a century plus experience, that that hundred and three is probably a little high; that brakes were starting to be applied somewhere during that scuff because the wheel did lock up at the end of it. Therefore, the hundred and three probably—it might be true, a hundred and three might actually be true there, but I'm being conservative saying there that I ought to reduce it down some due to the fact that at the end of it the wheel locked up. That's why ... I am saying there upwards of a hundred miles an hour.

[¶ 28] Thus, after having testified to his belief that critical speed scuff analysis can be applied with accuracy to scuff marks where there is no evidence of crossover and there is evidence of braking, a position contrary to the State's other expert witness and Irving's expert witness, Godfrey acknowledged the need to deviate from the formula because of the evidence of braking. He offered neither a scientific basis for such deviation nor a formula for determining the deviation. The only basis for Godfrey's deviation from a formula based upon established science was his "third of a century plus experience."

[¶ 29] In *State v. Boutilier,* 426 A.2d 876, 879 (Me.1981), the standard for determining the admissibility of expert opinion testimony was described as follows:

> When determining the admissibility of proffered expert opinion testimony in terms of its relevance and helpfulness to the jury, the presiding justice should evaluate whether what is claimed as "scientific" is really so, and in this regard one important (if not controlling) consideration is whether the matters involved have been generally accepted or conform to a generally accepted scientific theory.

[¶ 30] The divergence of Godfrey's opinion from Trooper Wright's and Dr. Bohan's opinions regarding the use of critical speed scuff analysis made it particularly important for the State to establish that Godfrey's determination of speed was premised entirely, not just partially, on an accepted scientific theory. Because the State failed to meet this burden, Godfrey's expert opinion was not shown to be reliable and should not have been admitted.

[¶ 31] Although I conclude that the trial court erred in admitting Godfrey's testimony, I concur in the Court's opinion because the error was harmless. "Error is harmless when it is highly probable that it did not affect the jury's verdict." *State v. DeMass,* 2000 ME 4, ¶ 17, 743 A.2d 233, 237. The State offered the expert opinion of Trooper Wright that Irving's vehicle was traveling a minimum of 73 mph in the field after leaving a road that was posted as a 35 mph speed zone. In addition, the

lay testimony and exhibits established, among other things, that even after Irving's vehicle left the road and crossed a grassy field, it was traveling at a rate of speed sufficiently high for it to become airborne immediately before striking a tree. The strength of the State's evidence, apart from Godfrey's expert opinion, supports the conclusion that it is highly probable that Godfrey's testimony did not affect the jury's verdict.