2005 ME 94

**Ronald SEARLES et al.**

v.

**FLEETWOOD HOMES OF PENNSYLVANIA, INC., et al.**

Supreme Judicial Court of Maine.

Argued: May 17, 2005.
Decided: Aug. 5, 2005.

Peter W. Schroeter, Esq. (orally), Aaron P. Burns, Esq., Smith Elloitt Smith & Garmey, P.A., Saco, for plaintiffs.

Stephen E.F. Langsdorf, Esq. (orally), Preti Flaherty Beliveau Pachios & Haley, LLC, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and LEVY, JJ.*

LEVY, J.

[¶ 1] This case arises from Ronald and Debra Searles's purchase of a home from Schiavi Homes, LLC, that was manufactured by Fleetwood Homes of Pennsylvania, Inc. After experiencing a series of problems with the home, including the growth of extensive mold, the Searleses filed a complaint seeking damages. Following a jury trial, the Superior Court (York County, *Brennan, J.*) entered a judgment awarding money damages in favor of the Searleses. Fleetwood and Schiavi assert that the court erred by (1) failing to exclude the testimony of the Searleses' expert witness; (2) finding that Fleetwood's conduct constituted a violation of the Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205–A to 214 (2002); and (3) failing to give a comparative negligence instruction. We affirm the judgment.

## I. BACKGROUND

[¶ 2] Viewed in a light most favorable to the jury's verdict, the record establishes the following facts. *See Sullivan v. Porter,* 2004 ME 134, ¶ 2, 861 A.2d 625, 628.

### A. The Searleses' Problems With Their Home

[¶ 3] The Searleses purchased their home in November 2000. Soon after they and their three young children moved into the home, the Searleses compiled a list of repairs that needed to be made. During a subsequent walk-through, a Schiavi representative assured the Searleses that somebody would contact them ˙ and that the repairs would be made.

[¶ 4] The Searleses did not hear from anyone and had to follow up with Schiavi to inquire about the repairs. In the interim, they were having a condensation problem with their windows.

[¶ 5] Fleetwood sent Mike Becker, an independent contractor, to the Searleses' home in February 2001. Becker was not able to fix all of the problems on the Searleses' repair list because he did not have the proper materials. With respect to the windows, Becker could not determine what was causing the condensation but promised the Searleses that he would have the window manufacturer contact them.

[¶ 6] Becker returned to the Searleses' home at the end of March. He told the Searleses that he had not heard anything with respect to the windows, but said that he would get in touch with Fleetwood and get the problem taken care of. He did some more work on the home, though he was again unable to complete the needed

* Justice Paul L. Rudman sat at oral argument and participated in the initial conference, but retired before this opinion was certified.

repairs because he did not have the proper materials.

[¶ 7] Becker worked at the Searleses' home a third time in May 2001. Debra testified that he still did not have enough materials to finish the needed repairs, and that although Becker said he would be back, they never heard from him again.

[¶ 8] Because of her concern regarding the condensation on the windows, Debra started trying to contact someone at Fleetwood. She was repeatedly told by Fleetwood's employees over the course of the summer that someone would be in touch with her. She never received a response.

[¶ 9] That fall, condensation from the Searleses' daughter's bedroom window soaked her bed, and the Searleses discovered mold growing on the bedpost, up the side of the window, on the trim, and on the inside of the curtains. Not having heard from anybody at Fleetwood, Debra called Schiavi and spoke with Cliff Hemingway. Hemingway visited the Searleses' home, agreed that the condensation problem with the windows needed to be remedied, and said that he would try to get in touch with Fleetwood.

[¶ 10] Debra did not hear from anybody, so she called Hemingway again. Hemingway advised her to contact the Maine Manufactured Housing Board because he did not believe that the Searleses were getting adequate service from Fleetwood. Debra filed a complaint with the Board in November.

[¶ 11] In response to the complaint, a Fleetwood representative visited the Searleses' home. The representative concluded that at least five, and possibly all, of the windows in the home needed to be replaced and that the mold needed to be remedied. Before leaving, the representative assured the Searleses that he would place the order for the windows himself and return to take care of their problems. The representative never returned.

[¶ 12] From January to April 2002, the Searleses repeatedly called Fleetwood to inquire when their windows would be replaced. On two separate occasions contractors were sent to the home, but the windows were not replaced either time.

[¶ 13] In April 2002, a Fleetwood contractor replaced the Searleses' windows. In the process of replacing the windows, the contractor discovered that mold was growing on the windowsills and frames, on the studs used to frame the windows, in the insulation near the windows, on and under the home's vinyl siding, and under the roof. After obtaining approval from Fleetwood, the contractor started replacing some of the mold-damaged studs and insulation. The contractor soon realized that the scope of the mold problem was beyond his ability to repair and, upon Fleetwood's instruction, stopped those efforts and simply replaced the windows.

[¶ 14] Fleetwood sent experts to the Searleses' home to do mold testing in May 2002. Their investigations documented active mold growth in the home and heightened airborne mold levels, as compared with levels outside.

[¶ 15] The Searleses subsequently sent Fleetwood a letter revoking their acceptance of the home. In response, Fleetwood offered to remediate the home and to pay for the family's lodging while the work was being done. The Searleses rejected the offer because Fleetwood never provided them with a detailed remediation plan and because they no longer trusted the company.

## B. Procedural Background and Trial

[¶ 16] The Searleses filed a complaint in October 2002 seeking damages on theories of, among other things, revocation of ac-

ceptance, unfair trade practices, and negligence. A jury trial was held in March 2004.

[¶ 17] Prior to the trial, Fleetwood and Schiavi (Fleetwood) filed a motion in limine requesting the court to exclude the testimony of one of the Searleses' expert witnesses, Dr. Susan Upham. The motion focused on evidence related to the Searleses' respiratory problems. The Searleses developed respiratory problems shortly after moving into their home. Their symptoms included coughing, postnasal drip, and sinus and chest congestion. Dr. Upham was expected to testify that the Searleses' symptoms were caused by an irritant reaction to volatile organic compounds (VOCs) emitted by the mold in their home. Invoking the *Daubert* standard, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Fleetwood asserted that there was "no evidence in the record demonstrating that [Dr. Upham's] opinion [was] based on any scientific testing [or methodology] that has been subject to peer review or that is otherwise generally accepted in the relevant scientific community." Accordingly, Fleetwood asked the court to exclude Dr. Upham's testimony.

[¶ 18] At the outset of the trial, the court preliminarily ruled that it would permit Dr. Upham to testify. Before she testified, however, the court gave Fleetwood an opportunity to reargue that her testimony should be excluded. Fleetwood reiterated its objections to Dr. Upham's testimony based on the arguments set forth in its motion in limine. The court then formally denied Fleetwood's motion. To counter Dr. Upham's testimony, Fleetwood offered expert testimony that the mold in the Searleses' home could not have caused their medical problems.

[¶ 19] The jury found that: (1) the Searleses were entitled to revoke their acceptance of the home; (2) Fleetwood committed an unfair or deceptive trade practice in violation of the Maine Unfair Trade Practices Act; and (3) Fleetwood was liable for negligence.[1] The Searleses were awarded damages in the amount of $62,708.59 plus interest for the revocation of acceptance count, $141,074 plus interest for the negligence count, $70,348.42 in attorney fees and costs for the unfair trade practices count, and $7168.85 in costs. This appeal followed.

## II. DISCUSSION

### A. Expert Testimony

[¶ 20] Fleetwood contends that the Superior Court erred in admitting Dr. Upham's testimony because no peer-reviewed, scientifically verified, and generally accepted studies support her conclusion that VOCs emitted by mold can cause irritant reactions of the type experienced by the Searleses.

[¶ 21] The Maine Rules of Evidence provide, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." M.R. Evid. 702. A proponent of expert testimony must establish that (1) the testimony is relevant pursuant to M.R. Evid. 401, and (2) it will assist the trier of fact in understanding the evidence or de-

---

1. The revocation of acceptance count was brought against both Schiavi and Fleetwood. The unfair trade practices and negligence counts were brought only against Fleetwood.

Fleetwood unsuccessfully moved for a judgment as a matter of law with respect to each count.

termining a fact in issue. *State v. Williams*, 388 A.2d 500, 504 (Me.1978).[2]

[¶ 22] "To meet the two-part standard for the admission of expert testimony, the testimony must also meet a threshold level of reliability." *In re Sarah C.*, 2004 ME 152, ¶ 11, 864 A.2d 162, 165. In cases where expert testimony "rests on newly ascertained, or applied, scientific principles," a trial court may consider whether "the scientific matters involved in the proffered testimony have been generally accepted or conform to a generally accepted explanatory theory" in determining whether the threshold level of reliability has been met. *Williams*, 388 A.2d at 504. General acceptance is not a prerequisite for admission, however. *Id.* A court has latitude to admit "proffered evidence involving newly ascertained, or applied, scientific principles [that] have not yet achieved general acceptance ... if a showing has been made [that] satisfies the [court] that the proffered evidence is sufficiently reliable to be held relevant." *Id.*

[¶ 23] Indicia of scientific reliability may include the following: whether any studies tendered in support of the testimony are based on facts similar to those at issue, *In re Sarah C.*, 2004 ME 152, ¶ 13, 864 A.2d at 165; whether the hypothesis of the testimony has been subject to peer review, *id.*; whether an expert's conclusion has been tailored to the facts of the case, *id.*; whether any other experts attest to the reliability of the testimony, *State v. Irving*, 2003 ME 31, ¶ 14, 818 A.2d 204, 208; the nature of the expert's qualifications, *id.*; and, if a causal relationship is asserted, whether there is a scientific basis for determining that such a relationship exists, *State v. Black*, 537 A.2d 1154, 1157 (Me.1988).

[¶ 24] We review a court's foundational finding that expert testimony is sufficiently reliable for clear error. *See State v. Pineo*, 2002 ME 93, ¶ 6, 798 A.2d 1093, 1096. Assuming that a court finds that there is a proper foundation, its decision whether to admit the testimony is a matter of discretion. *See Irving*, 2003 ME 31, ¶ 17, 818 A.2d at 209. The question in the present case—whether Dr. Upham's testimony should have been excluded because it was not sufficiently supported by the medical literature—speaks to whether her testimony was sufficiently reliable. Therefore, we review the court's finding that it was for clear error. *See Pineo*, 2002 ME 93, ¶ 6, 798 A.2d at 1096.

[¶ 25] In response to Fleetwood's motion in limine, the Searleses provided the court with eight scientific articles in support of Dr. Upham's position that airborne VOCs emitted by mold can cause a nonallergic irritant reaction in some individuals. Fleetwood argues that the eight articles demonstrate that Dr. Upham's position is "unproven, not clinically tested, and tenuous at best." To support its argument, Fleetwood quotes selected passages from the articles that suggest that Dr. Upham's opinion regarding causation is not generally shared in the scientific community:

---

**2.** Fleetwood contends that we should adopt the *Daubert* standard, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), based on its contention that we effectively eliminated consideration of "general acceptance" as an element to be considered when determining whether scientific evidence is admissible in *State v. Williams*, 388 A.2d 500 (Me.1978). Contrary to Fleetwood's argument, however, the *Williams* standard does not preclude the court from considering the question of general acceptance in undertaking its evaluation of challenged testimony. *Id.* at 504. Moreover, Fleetwood concedes that the result in this case would be the same whether we apply *Daubert* or *Williams*. Accordingly, we decline Fleetwood's invitation to adopt the *Daubert* standard in the present case.

"One of the major reasons that residential indoor standards have not been established is the absence of scientific evidence for adverse health effects in occupational settings with high concentrations of airborne fungi";[3] "[I]t has proven quite difficult to quantitate exposure to fungal allergens";[4] and "It is important to note that a link between [fungal VOCs] and any health effects is, at present, tenuous."[5]

[¶ 26] Whether a proposition has achieved general acceptance is a relative question. The challenged articles demonstrate that the relevant scientific community has not adopted generally accepted numerical benchmarks by which it can be determined what levels of exposure to airborne fungi will produce nonallergic irritant reactions in humans. Those articles, however, also reveal that many in the community have concluded that a causal relationship likely exists. For example, in one of the articles that Fleetwood quotes, the author states within that same paragraph, "It is considered likely that, where present, fungal VOCs can contribute to the mucosal irritation associated with some of the irritant or 'annoyance' forms of 'tight' or sick building syndrome."[6] Likewise, another article observes that "[f]ungi contain or produce many agents that can have irritant or toxic effects[,] ... [and] can cause irritant-type health effects in high concentration and have been implicated in building-related symptoms."[7] Thus, this is not a situation, such as we encountered in *Black*, in which there is "no scientific basis" for determining that a causal relationship exists. 537 A.2d at 1157.[8] Even if the proposition that fungal VOCs can

**3.** Emil J. Bardana, Jr., M.D., *Indoor Air Quality and Health, Does Fungal Contamination Play a Significant Role?*, 23 IMMUNOLOGY & ALLERGY CLINICS OF N. AM. 291, 294 (2003).

**4.** Robert E. Esch & Robert K. Bush, *Aerobiology of Outdoor Allergens, in* MIDDLETON'S ALLERGY: PRINCIPLES AND PRACTICE 529, 541 (6th ed., Mosby 2003).

**5.** W. Elliott Homer, Ph.D., et al., *Fungi*, 14 IMMUNOLOGY & ALLERGY CLINICS OF N. AM. 551, 562 (1994).

**6.** W. Elliott Horner, Ph.D., et al., *Fungi*, 14 IMMUNOLOGY & ALLERGY CLINICS OF N. AM. 551, 562 (1994).

**7.** Christine A. Rogers, Ph.D., *Indoor Fungal Exposure*, 23 IMMUNOLOGY & ALLERGY CLINICS OF N. AM. 501, 504 (2003) (citations omitted). *See also* Bardana, *supra* note 3, at 295 ("In the absence of chemical contamination, there is evidence that indoor fungal contamination could cause transient, irritational symptoms.") (citation omitted); Horner, *supra* note 5, at 558 ("The presence of fungi or conditions that are conducive to fungal growth have long been associated with adverse respiratory health effects.") (citation omitted); Robert E. Dales et al., *Adverse Health Effects Among Adults Exposed to Home Dampness and Molds*, 143 AM. REV. OF RESPIRATORY DISEASE 505, 509 (1991) ("In summary, increased respiratory (and other) complaints have been associated with the presence of home dampness and molds among both children and adults ·....''); B. Flannigan et al., *Allergenic and Toxigenic Microorganisms in Houses*, 70 J. OF APPLIED BACTERIOLOGY SYMP. SUPPLEMENT 61S, 61S (1991) ("[S]everal surveys have noted a strong relationship between reported mould growth and respiratory symptoms.") (citations omitted).

**8.** In *State v. Black*, 537 A.2d 1154, 1157 (Me. 1988), a mental health professional was prepared to testify that a victim of sexual abuse had also been sexually abused in the past based on certain "indicators" alleged to occur frequently in sexually abused children. We concluded that her testimony demonstrated no scientific basis for determining that a causal relationship exists between sexual abuse and clinical features of sexual abuse because, inter alia, the summary of symptoms encountered in her population of patients was impaired by selection bias and no testing was done with children who were not victims of sexual abuse to determine whether they exhibited similar indicators.

cause an irritant reaction of the type experienced by the Searleses has not gained general acceptance, Dr. Upham's testimony and the journal articles submitted by the Searleses indicate that the proposition cannot be discounted as the marginal view of a handful of members of the relevant scientific community.

[¶ 27] It was also established that Dr. Upham has extensive experience in diagnosing environmental health problems in a variety of settings; performs toxicology work associated with indoor air quality; has completed a two-year fellowship in environmental occupational medicine; and has practiced in the field for twelve years. If Dr. Upham were not a specialist with extensive experience in the field, there might be reason to scrutinize more closely her characterization and interpretation of the scientific literature. *See* DAVID H. KAYE ET AL., THE NEW WIGMORE: A TREATISE ON EVIDENCE, EXPERT EVIDENCE § 2.5.4 at 68 (Richard D. Friedman ed., 2004) ("Courts have been much too liberal about allowing doctors to testify to causation of injury outside the malpractice arena. Few doctors are trained in relevant disciplines."). Dr. Upham, however, is a specialist who has been trained to diagnose and treat people who have been exposed to substances such as molds.

[¶ 28] In addition, Dr. Upham's opinion was not formed in the abstract; it was tailored to the facts of this case. She personally examined Debra Searles, reviewed the relevant medical records, considered the reports of the experts who did mold testing at the Searleses' home, and completed a differential medical diagnosis.

[¶ 29] Based on the foregoing, several factors support the trial court's foundational finding that Dr. Upham's testimony was sufficiently reliable. Dr. Upham's qualifications established her as an expert in environmental occupational medicine, *see Irving*, 2003 ME 31, ¶ 14, 818 A.2d at 208; her conclusion that the Searleses experienced an irritant reaction to VOCs emitted by the mold in their home was based on the facts of this case, *see In re Sarah C.*, 2004 ME 152, ¶ 13, 864 A.2d at 165; and there is support in the relevant scientific community for her opinion regarding causation, *Black*, 537 A.2d at 1157. Because the record supports the court's finding that Dr. Upham's testimony was sufficiently reliable, the finding cannot be said to be clearly erroneous.

[¶ 30] Having established that the testimony was sufficiently reliable, the next question is whether the court erred in admitting it. Resolving close questions regarding the admission of expert testimony properly rests with the discretion of the trial judge. In contrast to our appellate review, the trial judge had the opportunity to observe Dr. Upham in person and to assess whether her effort to relate a body of unsettled scientific knowledge to the issue of causation was sufficiently coherent and cogent so as to be of assistance to the jury. In view of all of the circumstances, the court acted within the bounds of its discretion by treating the unsettled state of the relevant science as bearing on the weight to be afforded Dr. Upham's testimony, but not as precluding its consideration by the jury.[9]

9. In a related argument, Fleetwood contends that causation of damages in this case was impermissibly speculative. *See Crowe v. Shaw*, 2000 ME 136, ¶ 10, 755 A.2d 509, 512. Because Dr. Upham's testimony was the only evidence in the record establishing that the mold in the Searleses' home caused their medical problems, this argument hinges upon a finding that Dr. Upham's testimony was erroneously admitted. Because we affirm the trial court's admission of Dr. Upham's testi-

### B. Violation of the Unfair Trade Practices Act

■ [¶ 31] "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are ... unlawful." 5 M.R.S.A. § 207. In its jury instructions, the court explained: "[U]nfair and deceptive do not have precise definitions under our statutes[,] so we give these words the meanings that they have in ... everyday conversation." The jury later requested further instruction as to what "unfair" means, and the court repeated its prior instruction.

[¶ 32] Fleetwood notes that the Federal Trade Commission (FTC) has promulgated guidelines defining what constitutes an unfair trade practice pursuant to the Federal Trade Commission Act, 15 U.S.C.A. §§ 41–58 (West 1997 & Supp.2005). Fleetwood also points out that the Legislature has directed courts construing section 207 of the Maine Unfair Trade Practices Act to seek guidance from "the interpretations given by the [FTC] and the Federal Courts to" section 207's analogue in the Federal Trade Commission Act, 15 U.S.C.A. § 45(a)(1) (West 1997). *See* 5 M.R.S.A. § 207(1). Thus, Fleetwood argues that the court erred in not instructing the jury on the FTC's definition of unfair. Fleetwood contends that, at worst, it was guilty of bad service and breaches of warranty and contract, and that its conduct was not unfair as the FTC has defined the term. Fleetwood urges us either to vacate the Superior Court's judgment on the unfair trade practices count or to remand this matter for the court to apply the FTC guidelines.

■ [¶ 33] Although Fleetwood argued during the proceedings below that its conduct did not constitute an unfair trade practice, it did not frame its argument in terms of the FTC criteria.[10] Moreover, Fleetwood never objected to the court's unfair trade practice jury instruction. Therefore, Fleetwood's argument is unpreserved, and we review it only for obvious error. *Huber v. Williams*, 2005 ME 40, ¶ 17, 869 A.2d 737, 742. "Obvious error is error that constitutes such a serious injustice that reversal is necessary because we could not in good conscience let the judgment stand." *Coyne v. Peace*, 2004 ME 150, ¶ 14, 863 A.2d 885, 890.

---

mony, causation of damages was not impermissibly speculative.

10. The FTC criteria that Fleetwood cites in its brief, *see* Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed.Reg. 8355 (1964), are outdated. In a 1980 policy statement, the FTC refined its criteria for determining what constitutes an unfair or deceptive act. *See* Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), reprinted in H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess., at 36; *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1363–64 (11th Cir.1988); *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 970–72 (D.C.Cir.1985). The newer standard has since been codified, and it focuses on whether "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n) (1997). "In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination." *Id.* We have previously referenced this newer standard in *Suminski v. Maine Appliance Warehouse, Inc.*, 602 A.2d 1173, 1174 n. 1 (Me.1992); *see also* Jean Braucher, *Defining Unfairness: Empathy and Economic Analysis at the Federal Trade Commission*, 68 B.U. L. REV. 349, 407–09 (1988).

[¶ 34] Standing alone, garden variety breaches of warranty do not necessarily constitute an unfair or deceptive trade practice. *See Suminski v. Me. Appliance Warehouse, Inc.,* 602 A.2d 1173, 1174 (Me.1992). A breach of an implied warranty coupled with a persistent refusal to take responsibility for repairs, however, can support a finding of unfair or deceptive conduct. *See id.* Thus, refusing to take responsibility for repairs is an aggravating factor that can render commercial misconduct unfair, as that term is used in the Unfair Trade Practices Act. *See id.; see also In re Jeep Eagle Corp.,* 113 F.T.C. 792 (1990) (noting that, absent a consent order, the FTC would have charged Jeep Eagle with a violation of the Federal Trade Commission Act for breaching warranties by failing to make repairs within a reasonable amount of time).

[¶ 35] In this case, the jury found that the Searleses were entitled to revoke their acceptance of their home. *See* 11 M.R.S.A. § 2–608 (1995). The evidence further established that Fleetwood persistently failed to follow up on promised repairs and to complete the repairs to the Searleses' home within a reasonable amount of time. Taken together, these facts support a finding that Fleetwood's conduct was unfair or deceptive. Neither the court's failure to instruct the jury on the FTC's unfair trade practice guidelines nor its entry of a judgment in favor of the Searleses constitutes obvious error.

C. Comparative Negligence and Mitigation of Damages

[¶ 36] Fleetwood sought a comparative negligence instruction in connection with the Searleses' negligence claim based on its argument that the Searleses were negligent by failing to: (1) vacate their home; (2) stop home-schooling their children earlier; (3) buy an air filtration system; (4) attempt to determine if they were experiencing an irritant reaction to something other than mold; and (5) accept Fleetwood's offer to remediate. The court instructed the jury on mitigation of damages but did not instruct the jury on comparative negligence. Fleetwood argues that the court erred in failing to give a comparative negligence instruction. An appellant "can demonstrate entitlement to a requested instruction only where the instruction was requested and not given by the court and it: (1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing; and (4) is not otherwise sufficiently covered in the court's instructions." *Clewley v. Whitney,* 2002 ME 61, ¶ 8, 794 A.2d 87, 90. "In addition, the refusal to give the requested instruction must have been prejudicial to the requesting party." *Id.*

[¶ 37] Because both comparative negligence and mitigation instructions can result in a reduction in the amount of damages based on the reasonableness of the plaintiff's conduct, the practical effect of the instructions can be the same. *See Walter v. Wal–Mart Stores, Inc.,* 2000 ME 63, ¶ 28, 748 A.2d 961, 971. The major difference between the two is that in a comparative negligence instruction, the jury is told, "if the plaintiff's fault is equal to or greater than the defendant's fault, the plaintiff recovers nothing." *Id.* ¶ 27, 748 A.2d at 971. Accordingly, we have previously concluded that, in the absence of evidence that would permit a jury to find that the plaintiff's fault was equal to or greater than the defendant's, a defendant is not prejudiced by the fact that a jury was given a mitigation instruction as opposed to a comparative negligence instruction. *Id.* ¶ 29, 748 A.2d at 971–72.

[¶ 38] Distinguishing between comparative negligence and mitigation of damages is difficult because the doctrines

are similar. *See id.* ¶ 26, 748 A.2d at 970–71; *see also* W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 65 at 458–59 (5th ed.1984). A plaintiff's duty to mitigate damages arises after he or she has suffered an injury or loss, and focuses on whether the plaintiff took reasonable steps to avoid or reduce damages that were proximately caused by the negligence of the defendant. *See Walter,* 2000 ME 63, ¶ 27 n. 7, 748 A.2d at 971; Horton & McGehee, *Maine Civil Remedies* § 4–3(d)(1) n. 77 at 69 (4th ed.2004). Comparative negligence, in contrast, focuses on whether the plaintiff's negligence was a proximate cause of the underlying harm that gave rise to the plaintiff's damages. *See Walter,* 2000 ME 63, ¶ 27 n. 7, 748 A.2d at 971. For a comparative negligence instruction to have been warranted, the Searleses' negligence must have been a legal cause of their damages. *Id.* The actions cited by Fleetwood in support of its comparative negligence instruction regard steps the Searleses might have taken to reduce the damages they suffered as a result of Fleetwood's (1) negligent construction of the home, and (2) negligent failure to make repairs once the mold and airborne fungi were discovered.

[¶ 39] A comparative negligence instruction was not warranted in connection with Fleetwood's negligent construction liability because the Searleses' failure to take the actions suggested by Fleetwood could not have been a contributing proximate cause of the harm associated with the negligent construction. The Searleses had no reason to take the remedial steps Fleetwood claims they should have taken until after the mold and airborne fungi were discovered, which was long after the construction of the home was completed.

[¶ 40] A comparative negligence instruction was also not warranted in connection with Fleetwood's negligent failure to repair the home. The record demonstrates that it is questionable whether the Searleses were even negligent. There was no evidence in the record that taking precautions such as buying an air filtration system or obtaining additional testing to determine whether they were experiencing an irritant reaction to something other than mold would have alleviated their symptoms. Thus, there is no evidence that such failures to act caused their problems. *See Crocker v. Coombs,* 328 A.2d 389, 392 (Me.1974) (noting that a defendant who asserts comparative negligence has the burden of proving the plaintiff's causal negligence by a fair preponderance of the evidence). Furthermore, the Searleses testified that simply leaving the home was not an option because of financial considerations. Assuming for the sake of argument that the Searleses' failure to take the steps suggested by Fleetwood constituted negligence, the jury could not have found, based on the above, that the Searleses' negligence was equal to or greater than Fleetwood's negligence, as their "deviation from correct behavior" was slight compared to that of Fleetwood. *See Jackson v. Frederick's Motor Inn,* 418 A.2d 168, 173 (Me.1980).

[¶ 41] Under the circumstances presented, it was proper for the court to instruct the jury on the Searleses' duty to mitigate their damages, and the court did not err in refusing Fleetwood's comparative negligence instruction.

The entry is:

Judgment affirmed.