2010 ME 61

**Gary TIBBETTS**

v.

**DAIRYLAND INSURANCE CO. et al.**

Supreme Judicial Court of Maine.

Argued: May 19, 2010.
Decided: July 15, 2010.

Arthur J. Greif, Esq. (orally), Julie D. Farr, Esq., Gilbert & Greif, P.A., Bangor, ME, for Gary Tibbetts.

Jon A. Haddow, Esq. (orally), Farrell, Rosenblatt & Russell, Bangor, ME, for Dairyland Insurance Company.

James D. Poliquin, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, ME, for MMG Insurance Company.

Panel: SAUFLEY, C.J., and LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SILVER, J.

[¶ 1] Gary Tibbetts appeals from a judgment entered in the Superior Court (Penobscot County, *Murphy, J.*) following a jury trial that awarded him damages for injuries stemming from a motor vehicle collision. The issues we address on appeal involve the payment of underinsured motorist insurance. Dairyland Insurance Co. cross-appeals in part because it contests the allocation of payment among the underinsured motorist insurance carriers. This is an issue requiring clarification, and we discuss it below. We affirm the judgment except as to the award of medical payments benefits pursuant to Count III, which is vacated.

## I. FACTUAL AND PROCEDURAL BACKGROUND

[¶ 2] Tibbetts was injured on June 15, 2006, when the motorcycle he was operating collided with a car. Tibbetts owned a motorcycle repair business and had taken a customer's motorcycle home that evening, extending his ride because of the nice weather. Tibbetts testified that repairs that he planned to do the next morning would require that the motorcycle have a warm engine. During his ride, a car pulled out in front of Tibbetts, causing an accident that resulted in serious injuries to him.

[¶ 3] The driver's insurance company paid Tibbetts the full limits of its liability coverage, $100,000. Tibbetts initiated this action to collect his remaining damages under various uninsured/underinsured motorist (UM) policies.[1] The jury returned a verdict for Tibbetts awarding $325,000 in total damages. The jury specifically found that Tibbetts's use of the motorcycle, which the parties stipulated constituted a test drive, had been with permission of the owner.

[¶ 4] Five insurance policies potentially provide UM coverage for Tibbetts. Dairyland had issued three motorcycle insurance policies: to Clark, the owner of the motorcycle; to Tibbetts; and to Tibbetts's girlfriend and business partner in a policy that included Tibbetts as an insured. MMG Insurance Company had issued an automobile policy covering Tibbetts. Finally, National Indemnity Company had issued a "garage policy" providing liability insurance. Following a court determination that National Indemnity's failure to provide UM coverage violated 24–A M.R.S. § 2902 (2009), National Indemnity settled with Tibbetts for $30,000, leaving the three Dairyland policies and the MMG policy remaining at issue in the case. All the parties agree that pursuant to policy language, the Dairyland policy issued to the motorcycle's owner (Clark policy) is the primary UM policy, while the other Dairyland policies and the MMG policy are excess policies.

[¶ 5] In addition to its UM coverage, the Dairyland Clark policy provides for medical payments benefits of up to $5000 per person, but only covers people who are occupying the motorcycle with the insured's permission. The policy excludes medical payments for "[a]nyone *occupying a motorcycle* used in the business of selling, repairing, servicing, storing or parking *motor vehicles.*" The other Dairyland policies each provide coverage of up to $1000

---

1. Uninsured/underinsured motorist coverage is coverage mandated by statute to protect persons who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles. *See* 24–A M.R.S. § 2902(1) (2009). An "underinsured motor vehicle" is a vehicle "for which coverage is provided, but in amounts less than the minimum limits for bodily injury liability insurance provided for under the motorist's financial responsibility laws of this State or less than the limits of the injured party's uninsured vehicle coverage." *Id.*

per person for medical payments, but exclude coverage for occupants of motorcycles being put to a business use.

[¶ 6] During trial, the court instructed the jury regarding mitigation of damages. In the course of that instruction, the court misstated a burden of proof, stating that the burden was on the plaintiff to prove that he could have reduced his damages. Tibbetts did not object.

[¶ 7] In its judgment, the court reduced the $325,000 verdict award by $130,000 received in settlements, and used the resulting figure, $195,000, to calculate prejudgment interest. Because $195,000 was less than the $250,000 limit provided by the primary Dairyland Clark policy, the court ordered Dairyland to pay the full amount. The court additionally found that although Tibbetts was engaged in a test drive of Clark's motorcycle at the time of the accident, that activity was not encompassed by the policy's exclusion of medical payment coverage for motorcycles used in a motor vehicle sales or repair business. Consequently, the court concluded that Dairyland was responsible for paying $5000 in medical benefits under its policy. In a subsequent hearing, the court addressed an additional count of the complaint claiming a violation of the prompt payment statute, and after holding that there was no violation, the court entered its final judgment on July 25, 2008.

## II.  DISCUSSION

[¶ 8] Tibbetts and Dairyland both raise a number of issues on appeal. We address the arguments that the court erred: (1) in its instruction to the jury regarding mitigation of damages; (2) by deducting a settlement with an excess insurer from the verdict award; (3) by deducting the settlement amounts from the total damages awarded instead of applying them to offset the primary UM policy coverage limits; and (4) by awarding medical payment ben-

efits based on its finding that the policy's business use exclusion did not apply. The remaining issues raised by Tibbetts do not merit discussion.

### A.  Jury Instruction

■ [¶ 9] Tibbetts argues that the court erred when instructing the jury regarding the duty to mitigate damages because it erroneously substituted the word "plaintiff" for "defendant" when discussing the burden of proof. "We review jury instructions in their entirety to determine whether they fairly and correctly apprised the jury in all necessary respects of the governing law." *WahlcoMetroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 14, 991 A.2d 44, 47–48 (quotation marks omitted). Tibbetts did not object to the mitigation instruction at trial, and therefore the instruction is reviewed for obvious error. *See Searles v. Fleetwood Homes of Pa., Inc.*, 2005 ME 94, ¶ 33, 878 A.2d 509, 519.

■ [¶ 10] Tibbetts has failed to demonstrate obvious error. Under an obvious error review, Tibbetts must prove "a seriously prejudicial error tending to produce a manifest injustice." *State v. Elliott*, 2010 ME 3, ¶ 22, 987 A.2d 513, 520. Tibbetts is correct in his assertion that the court misstated the party bearing the burden of proof. *See Lee v. Scotia Prince Cruises Ltd.*, 2003 ME 78, ¶ 22, 828 A.2d 210, 216 (stating that a defendant has the burden to show that the plaintiff failed to mitigate damages). However, there is no evidence that the jury considered the absence of mitigation of damages, and because "[a] finding of obvious error is a serious one that should be utilized sparingly and must be limited only to extreme circumstances," the error is not "of the exceptional kind that seriously affected the fairness or integrity of the proceeding." *See Reno v. Townsend*, 1997 ME 198, ¶ 5,

704 A.2d 309, 311 (quotation marks omitted).

## B. Offset of UM Insurer Settlement

■ [¶ 11] Tibbetts does not challenge the court's deduction of the tortfeasor's payment from the damages award, which the statute explicitly requires. *See* 24–A M.R.S. § 2902(4). However, Tibbetts argues that because National Indemnity was an excess insurer and therefore not required to pay any money, the court erred by deducting its $30,000 pre-trial settlement from the verdict award. We disagree, and affirm the calculation.

■ [¶ 12] The goal of the UM statute "was to provide an injured insured the same recovery which would have been available had the tortfeasor been insured to the same extent as the injured party." *Jipson v. Liberty Mut. Fire Ins. Co.*, 2008 ME 57, ¶ 8, 942 A.2d 1213, 1216 (quotation marks omitted). The statute does not support double recovery or a windfall to the plaintiff. *See id.* ¶ 9, 942 A.2d at 1216 ("There is no Maine authority to support [the plaintiff]'s contention that an insured injured by a single tortfeasor may recover a total that is greater than the insured's UM coverage limit."). In keeping with this goal, any compensatory payments received by the plaintiff reduce the gap in coverage, and are offset against the judgment.

## C. Offset Method

■ [¶ 13] In its cross-appeal, Dairyland challenges the court's application of the offset of the $130,000 received from the tortfeasor and from National Indemnity. It argues that under our decision in *Cobb v. Allstate Ins. Co.*, 663 A.2d 38 (Me. 1995), the settlements should be applied to offset the primary UM policy's coverage limits, so that the Dairyland Clark policy, as the primary policy, gains the full benefit of the offset. We disagree, affirm the

court's allocation, and clarify the offset method applicable in UM insurance cases.

[¶ 14] Under the court's allocation the $325,000 judgment was reduced by the $130,000 settlement amounts, producing a judgment for $195,000. Because this judgment amount was within the Dairyland Clark policy's liability limits of $250,000, Dairyland was ordered to pay the entire judgment amount. Under Dairyland's proposed approach, which we will refer to as the "liability offset" approach, the court would instead subtract the $130,000 from the Clark policy's $250,000 liability limitation, producing a maximum liability of $120,000. Dairyland would then pay the $120,000 under its Clark policy, and the excess insurers would pay the remaining $75,000 according to their percentage share.

■ [¶ 15] "We have long held that insurers may offset the amount of coverage available in UM policies to the insured by the amount actually paid by the tortfeasor," *Jipson*, 2008 ME 57, ¶ 9, 942 A.2d at 1216, and the statute in fact mandates this offset, *see* 24–A M.R.S. § 2902(4). The statute does not, however, clarify the allocation of the offset in multiple UM insurer cases.

[¶ 16] In cases involving multiple primary UM insurers, we have consistently applied a *pro rata* offset approach. *See Cobb*, 663 A.2d at 40. In *Cobb*, we addressed the question of offset as between a primary and an excess UM insurer. *Id.* at 39–40. We held that the offset there was properly applied to the primary policy's liability limits, rather than pro-rated between the primary and excess insurer, because the excess policy "has no applicability at all until the primary coverage is exhausted. The denial of any setoff to [the excess insurer] is a logical corollary to the lack of risk it faces until [the plaintiff] has sustained damages above [the primary

policy's limit]." *Id.* at 40. Underlying our conclusion in *Cobb* was our goal to encourage prompt settlement of claims. *See id.* at 41. We therefore held that "[a]pplication of any monies received by an insured from a tortfeasor as an offset to the first-tier provider's liability is more logical and efficient than prorating." *Id.; see also Beal v. Allstate Ins. Co.,* 2010 ME 20, ¶ 6, 989 A.2d 733, 737 (citing Cobb for the liability offset approach); *Skidgell v. Universal Underwriters Ins. Co.,* 1997 ME 149, ¶ 10, 697 A.2d 831, 834 (describing *Cobb's* holding as: "where one insurer's underinsurance coverage is primary, and another's underinsurance coverage is excess, the primary insurer is entitled to a setoff against its liability of the entire amount recovered from a tortfeasor"). *Cobb,* however, addressed a choice between the liability offset approach and a *pro rata* approach. It did not discuss the third option that we adopt here: a "gap approach."

[¶ 17] In enacting the UM statute, "the Legislature intended to permit the injured party to recover the amount he would have received had the tortfeasor been insured to the same extent as the injured party." *Connolly v. Royal Globe Ins. Co.,* 455 A.2d 932, 936 (Me.1983). We have therefore characterized UM insurance as "gap coverage." *See Jipson,* 2008 ME 57, ¶ 8, 942 A.2d at 1216. Consistent with this concept, under the gap approach, a court allocates the offset by first determining the gap in coverage, and then assigning insurers to cover that gap depending on their status as primary or excess.

[¶ 18] In the first step, determining the gap, the court initially asks what amount the injured party would recover if the tortfeasor were insured to the amount of the injured party's UM coverage. If damages are less than the total policy limits, as here, the injured party would recover his damages in full. If damages exceed the

total limits, he would recover that total limit. After determining this recovery amount, the court then subtracts the amounts already paid by the tortfeasor or by insurers in settlement, and thereby determines the coverage gap.

[¶ 19] In the second step, allocating responsibility to pay, the court first assigns payment to the UM insurers who contracted to be primary insurers, and then, if there is an excess, to the excess UM insurers. Therefore the insurers who contracted for greater UM liability as the primary UM insurers have the first obligation to pay.

[¶ 20] The liability offset approach, in contrast, can produce a result where the primary UM insurer pays nothing, and the excess UM insurers pay the damages. For example, if in this case the primary UM policy had a liability limit of $100,000, applying the liability offset approach would result in the primary insurer paying nothing, because its $100,000 coverage limit would be reduced by the money received in settlements, and the excess insurers would be left to pay the remaining damages. This approach is illogical and inconsistent with the policy of fair allocation of economic risk between insurers, *see Beal,* 2010 ME 20, ¶ 36, 989 A.2d at 744, and, to the extent our prior decisions adopt this approach, we abandon it now.

[¶ 21] "[T]he statute specifically mandates coverage that fills the gap left by an underinsured tortfeasor," *Tibbetts v. Me. Bonding & Casualty Co.,* 618 A.2d 731, 734 (Me.1992), and the gap approach is consistent with this goal. Because it is driven by the statute, we apply this approach regardless of the offset language employed by the policies. *See id.* at 732 ("[W]hen the terms of an insurance policy conflict with mandatory statutory provisions, the statutory provisions must prevail."). Because the court properly assigned payment

of the coverage gap amount to the primary UM insurer, we affirm the judgment.

## D. Interpretation of Business Use Exclusion

[¶ 22] The jury found that at the time of the accident, Tibbetts was using the customer's motorcycle with the owner's permission, and the parties had agreed that upon such a finding they would stipulate that Tibbetts was engaged in a test drive of the motorcycle. Dairyland argues that this use of the motorcycle for test drive purposes fell within its policy clause excluding medical payments benefits for injuries sustained on a motorcycle "used in the business of selling, repairing, servicing, storing or parking motor vehicles." Although the motorcycle was not regularly used as a part of Tibbetts's business, Dairyland contends that at the time of the accident, it was being used in the business, and that therefore the court erred by holding that payment of medical benefits was required.

[¶ 23] "The interpretation of an insurance contract exclusion and its applicability is a matter of law reviewed de novo. Exclusions and exceptions in insurance policies are disfavored and are construed strictly against the insurer." *Pease v. State Farm Mut. Auto. Ins. Co.*, 2007 ME 134, ¶ 7, 931 A.2d 1072, 1075 (quotation marks omitted). Consistent with the legislative intent to provide broad UM coverage, in *Pease* we examined a policy exclusion to UM coverage and endorsed looking at the status of the vehicle involved "[a]t the moment" of the collision. *See id.* ¶¶ 9–10, 931 A.2d at 1075; *see also Peerless Ins. Co. v. Hannon*, 582 A.2d 253, 254 (Me.1990) (interpreting exclusion language and looking at the status of the person involved "at the time liability arose.").

[¶ 24] Looking at the use of the motorcycle at the time of the accident, we conclude that the test drive fits the policy exclusion because the motorcycle was being used as part of the repair process. Therefore we vacate the judgment on this count, holding that medical payments benefits are excluded by the policy language.

The entry is:

Judgment affirmed except as to the award of medical payments benefits pursuant to Count III, which is vacated.