MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2016 ME 21
Docket:      Cum-15-48
Argued:      September 16, 2015
Decided:     January 26, 2016

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and
             HUMPHREY, JJ.

ELENA WECHSLER

v.

JOHN P. SIMPSON

HJELM, J.

[¶1]   John P. Simpson appeals from a judgment of divorce from Elena Wechsler entered in the District Court (Portland, *Powers, J.*), after it adopted and modified the report of a referee.  Simpson argues that the judgment is affected by error because the referee did not give proper weight and consideration to statutory factors when (1) determining primary residence for the parties' minor children, *see* 19-A M.R.S. § 1653(3) (2015), and (2) dividing the marital estate, *see* 19-A M.R.S. § 953(1) (2015).  We affirm the judgment.

## I.  BACKGROUND

[¶2]  By agreement of the parties, the court (*Kelly, J.*) appointed a referee to recommend a judgment in this divorce matter.  *See* 19-A M.R.S. § 252 (2015); M.R. Civ. P. 53, 119.  After a hearing, the referee found the following facts, which

2

are based on competent evidence in the record and which the court adopted in full with one modification, as discussed below. *See Raisen v. Raisen*, 2006 ME 49, ¶ 2, 896 A.2d 268.

[¶3] Elena Wechsler and John P. Simpson were married in May 2008 and are the parents of two minor children, who were born in July 2009 and November 2011. The family resided in a house in Cumberland Foreside that Simpson had purchased in 2004 for $550,000. In 2011, during the marriage, Simpson refinanced the house and conveyed it to himself and Wechsler as joint tenants. At that time, the house had an appraised value of $690,000.

[¶4] Simpson earned advanced degrees in business and law before his marriage to Wechsler. From 1996 until 2012, he ran a successful company, but he was forced to go out of business in 2012 due to a costly lawsuit. He then passed the Maine bar examination and began working part-time for a local attorney, while also searching for more stable employment. Wechsler was gainfully employed as a radiologist throughout the marriage.

[¶5] In September 2013, Wechsler moved out of the family home and filed a complaint for divorce. The parties agreed to residential arrangements for their children during the pendency of the divorce action. Wechsler moved for the appointment of a guardian ad litem, *see* 19-A M.R.S. § 1507(1) (2015); M.R. Civ. P. 107(a)(2), and the court (*Najarian, M.*) granted her motion in

November 2013. Later, in July 2014, the court (*Kelly, J.*) granted the parties' joint motion to appoint a referee, *see* 19-A M.R.S. § 252; M.R. Civ. P. 53, 119, and ordered the referee to prepare a report setting forth findings of fact and conclusions of law on "all issues raised by the pleadings." The parties reserved the right to object to the report but agreed that if there were no objections, the court could enter a judgment on the report as filed. *See* M.R. Civ. P. 53(e)(2).

[¶6] The referee held a one-day hearing in August 2014, where both parties and the guardian ad litem testified.[1] Wechsler requested that she be awarded primary residence of the children, asserting that she had been the children's primary caretaker and that Simpson had contributed minimally to the children's care. In contrast, Simpson requested "shared primary residential care," 19-A M.R.S. § 1653(2)(D)(1) (2015), and maintained that he had played a significant role in the children's upbringing.

[¶7] During the hearing, the guardian ad litem's report was admitted in evidence without objection. The report substituted for his testimony on direct examination, and he then presented oral testimony and was subject to examination by the parties. In the report and in his testimony, the guardian ad litem stated that although Simpson worked from home, he rarely interacted with his children during

---

[1] Although the hearing before the referee was not recorded, the referee filed an extensive statement of the evidence, which is a part of the record on appeal pursuant to M.R. App. P. 5(d).

the daytime and that two nannies cared for the children almost exclusively until Wechsler returned from work, when she would assume the responsibilities of primary caregiver for the children. In his report, the guardian ad litem also considered "well-established principles of child development" bearing on residence and parent-child issues as applied by the state of Washington. Those principles recommend primary, rather than shared, residence for young children. The guardian ad litem wrote, however, that while Washington's guidelines and the underlying theories of child development are instructive, "we live in the state of Maine, the laws of Washington are not applicable to our laws, and our state should not and cannot follow the laws or guidelines of another state." Either directly or in substance, the guardian ad litem applied each of Maine's best interest factors, *see* 19-A M.R.S. § 1653(3), and on that basis recommended that in light of the children's young ages and Wechsler's historically greater contributions to their care, they should reside primarily with her.

[¶8] In October 2014, the referee filed her report with the court, adopting the guardian ad litem's findings and recommendation that the children should primarily reside with Wechsler. The referee further recommended that the parties share parental rights and responsibilities, and that Simpson have rights of contact with the children at his residence approximately two days each week. Based on the parties' agreement, the referee recommended that Simpson would not be

responsible for child support, but to set a baseline for future modifications, the referee found that Wechsler earned $216,000 annually and imputed Simpson's income to be $30,000 annually.

[¶9]  Regarding the division of the marital estate, the referee found that Wechsler had contributed more toward the acquisition of marital property than Simpson.  *See* 19-A M.R.S. § 953(1)(A).  Nevertheless, because of Wechsler's stronger financial position arising from her income and the value of her nonmarital property, *see id.* § 953(1)(B)-(C), the referee recommended that Simpson receive more than half of the value of the marital estate.  Among other things, the referee awarded Simpson the marital residence, which was valued at $690,000 with a mortgage balance of $351,492, leaving equity of approximately $340,000.  The referee also assigned Simpson $90,000 in marital credit card debt, which Simpson had accumulated "in part trying to save his business and in part on his living expenses" after the parties separated.

[¶10]  The referee awarded Wechsler, as nonmarital property, the sum of $93,542 from a USAA savings account.  Wechsler owned this account before the marriage, and this was the approximate balance as of the date of the marriage.[2] The account remained in Wechsler's name alone during the marriage, and as the

---

[2]  Although the referee found that Wechsler's USAA savings account had a balance of $93,716.75 at the time of the marriage, Wechsler requested that a slightly smaller amount—$93,542—be set aside to her as nonmarital property, and this is the amount that the referee awarded.

referee noted, Wechsler testified that the balance never fell below the premarital value. The referee further found that the value of the account increased by approximately $164,000 over the course of the marriage, and that the increase was entirely marital in nature. Of the marital portion of the account, the referee set aside $100,000 to Simpson and the balance to Wechsler. Finally, the referee found that although Simpson had $90,000 in cash when the parties married, he was not entitled to an award in this amount as nonmarital property, because the money had "been spent." In the end, the referee recommended that Simpson receive marital assets and debts with a net value of more than $462,000, and that marital assets with a value of approximately $361,000 be awarded to Wechsler.

[¶11] Simpson filed a timely objection to the referee's report after it was filed with the court, challenging the referee's primary residence determination and division of the marital estate. *See* M.R. Civ. P. 53(e)(2). After a hearing, the court (*Powers, J.*) entered an order in January 2015 denying Simpson's objection but modifying the report by adding a sentence stating that "shared residence" was not in the children's best interests. *See* 19-A M.R.S. § 1653(2)(D)(1). The court adopted the report as modified as a final divorce judgment, from which Simpson timely appealed. *See* 14 M.R.S. § 1901 (2015); M.R. App. P. 2(b)(3).

## II. DISCUSSION

[¶12]   Simpson appeals from aspects of the divorce judgment affecting parental rights and responsibilities and the division of the marital estate.  With the exception of his claim of error in the court's modification of the referee's report, his arguments consist of challenges to recommendations made by the referee and adopted by the court.  "When a trial court accepts a report of a referee, the findings of the referee become the trial court's findings, and we review those findings directly."  *Warren v. Warren*, 2005 ME 9, ¶ 19, 866 A.2d 97; *see also* M.R. Civ. P. 52(c).  On appeal, a referee's factual findings and choice of remedies based on those findings are entitled to the same degree of deference as those of a trial court.  Alexander, *Maine Appellate Practice* § 424 at 288 (4th ed. 2013).  The referee's findings are "entitled to very substantial deference because [the referee was] able to appraise all the testimony of the parties and their experts."  *Grant v. Hamm*, 2012 ME 79, ¶ 6, 48 A.3d 789 (quotation marks omitted).  Because the court accepted the referee's report and incorporated its findings and conclusions into its judgment, we review the referee's factual findings for clear error, and her recommendations regarding parental rights and the division of the marital estate for an abuse of discretion.  *See Young v. Young*, 2015 ME 89, ¶¶ 5, 13, 120 A.3d 106 (describing the standard by which this Court reviews a trial court's findings and

8

conclusions); *Warren*, 2005 ME 9, ¶¶ 44-47, 866 A.2d 97 (applying the same standard of review to the findings and conclusions of a referee).

A.    Primary Residence

[¶13]  Simpson challenges the provisions in the judgment awarding primary physical residence to Wechsler, arguing that (1) the guardian ad litem's report was tainted by use of an improper best interest standard; (2) the denial of his request for shared primary residential care was erroneous; and (3) the court erred by supplementing the referee's report with language required by statute when a parent's request for shared primary residential care is denied.  We consider these arguments in turn.

1.    Standard Applied by the Guardian ad Litem

[¶14]  Simpson first contends that the guardian ad litem's analysis, which was adopted by both the referee and the court, was improperly premised on Washington law and guidelines, rather than on Maine's statute prescribing the best interest analysis.  *See* 19-A M.R.S. § 1653(3).

[¶15]  Pursuant to 19-A M.R.S. § 1507(4) (2015), a "guardian ad litem shall use the standard of the best interest of the child as set forth in section 1653" when reporting findings and recommendations to a court.  Contrary to Simpson's contentions, the guardian ad litem fully complied with this requirement.  During his testimony, the guardian ad litem stated that Washington's guidelines are

informative on child development and are relevant in this action only to the extent that they address factors included in Maine's statute. Further, in his report, the guardian ad litem explicitly stated that "our state should not and cannot follow the laws or guidelines of another state." The guardian ad litem thereby expressly demonstrated a clear understanding that his analysis was to be governed by the best interest standard established in Maine law.

[¶16] The substance of the guardian ad litem's analysis also demonstrates his faithfulness to Maine law. His detailed seriatim findings methodically follow the best interest factors enumerated in section 1653(3), with particular emphasis placed on section 1653(3)(B) because the children had come to depend chiefly on Wechsler as their primary caretaker for their "care and security," and on section 1653(3)(E) because primary rather than shared residential care would provide the most stable living arrangement given the children's ages and developmental needs.

[¶17] We have noted that "the most effective challenge to the quality, completeness, or competence of a guardian ad litem's work will be accomplished through cross-examination of the GAL at trial." *Adoption of T.D.*, 2014 ME 36, ¶ 18, 87 A.3d 726. Here, at the hearing before the referee, Simpson had an opportunity to cross-examine the guardian ad litem on any and all aspects of his recommendations. The referee was then responsible for evaluating the guardian ad litem's testimony, which had been subject to challenge on cross-examination, to

determine the weight she felt it deserved. Neither the evidentiary process nor the referee's treatment of the guardian ad litem's report and recommendations was affected by error.

2.    Denial of Shared Primary Residential Care

[¶18] Simpson next argues that the referee erred by failing to find or explain why shared primary residential care was not in the children's best interests, and that the judgment, which adopts the referee's analysis, is therefore deficient.

[¶19] Title 19-A M.R.S. § 1653(2)(D)(1) authorizes an award of shared primary residential care and also sets out the requirements that a court must follow when denying a party's request for such an award:

> An award of shared parental rights and responsibilities may include either an allocation of the child's primary residential care to one parent and rights of parent-child contact to the other parent, or a sharing of the child's primary residential care by both parents. If either or both parents request an award of shared primary residential care and the court does not award shared primary residential care of the child, the court shall state in its decision the reasons why shared primary residential care is not in the best interest of the child . . . .

The statute does not define "shared primary residential care" or explain how it might differ from an award of primary residence to one parent with rights of contact to the other parent that would occur at that parent's residence, which is what the judgment here provided and allowed. Because the court construed the

referee's report as rejecting shared primary residential care, we proceed on that assumption for purposes of our analysis.[3]

[¶20] Here, the referee's report did not expressly set out a finding that shared primary residential care was not in the children's best interests. The referee did, however, rely on and adopt the findings of the guardian ad litem, which, as we have discussed, applied the best interest standard established in Maine law. Based on that framework, the guardian ad litem concluded that the children's best interests would be promoted if they were to reside primarily with one parent and that, because of her historical role as the children's primary caretaker, that parent should be Wechsler. *See* 19-A M.R.S. § 1653(3)(B), (E). This is an express conclusion that the grant of the children's primary physical residence to Wechsler is in the children's best interests, and an implicit explanation of the reasons why shared primary residential care is not in their best interests.

[¶21] The guardian ad litem's analysis therefore demonstrates that his recommendation arose directly from consideration of the proper statutory considerations and is sufficient to explain the reasoning underlying the parental rights determination, *see Grant*, 2012 ME 79, ¶ 13, 48 A.3d 789, including the

---

[3] If the residence and contact provisions of this particular divorce judgment are, in effect, a form of "shared primary residential care," then Simpson's challenges based on 19-A M.R.S. § 1653(2)(D)(1) (2015) necessarily fail. We need not reach that predicate question, however, because even if the judgment's parenting provisions are different from "shared primary residential care," Simpson's challenges are not persuasive.

implicit denial of Simpson's request for shared primary residential care of the children. The record as a whole is therefore sufficient to support the referee's recommendation that the children live primarily with Wechsler and have contact with Simpson approximately two days each week. Accordingly, the referee's recommendation for the children's primary physical residence, which the court adopted, was well within the bounds of her discretion.

3.    Modification of the Referee's Report

[¶22]    Simpson makes a related argument that the court erred by supplementing the referee's report with language required by 19-A M.R.S. § 1653(2)(D)(1) to explain the denial of Simpson's request for shared primary residential care, without first receiving, or instructing the referee to receive, further evidence to determine whether that arrangement was in the children's best interests.

[¶23]  When a party files a timely objection to a referee's report, "the court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." M.R. Civ. P. 53(e)(2).  "If the [trial court] modifies the referee's report, we review the evidence to see whether it supports the referee's finding, or the court's modification." *Hennessy v. Fairley*, 2002 ME 76, ¶ 18, 796 A.2d 41 (quotation marks omitted).

[¶24] Here, Simpson filed an objection to the referee's report. After holding a hearing on the objection, the court adopted the report in full and added one sentence: "[Simpson's] request for shared residence is denied and is not in the children's best interest, and primary residence with [Wechsler] is in their best interest based on the GAL's recommendation and the facts supporting it as outlined earlier in this paragraph." When seen in the context of the report, this sentence is merely a way of characterizing the express finding already made by the referee—that it would be in the children's best interests if they were to live primarily with Wechsler, which itself implies that shared residence is *not* in their best interests. *But see supra* n.3. As the court correctly noted, "It is clear what the referee intended." The added sentence therefore is fully supported by the referee's findings and was not erroneous, *see Hennessy*, 2002 ME 76, ¶ 18, 796 A.2d 41, and it was unnecessary for the court to receive further evidence or recommit the matter to the referee before adding the explanatory language.

B.    Equitable Division of Marital Property

[¶25] Simpson next challenges the division of the marital estate, arguing that in her report, the referee failed to fashion a "just" division of marital property because she did not consider "all relevant factors" including each spouse's "contribution . . . to the acquisition of the marital property," the "value of the property set apart to each spouse," and the parties' "economic circumstances."

14

19-A M.R.S. § 953(1). We review the division of marital property and allocation of marital debt for an abuse of discretion and "will vacate a judgment only if no competent evidence exists in the record to support it." *Young*, 2015 ME 89, ¶ 13, 120 A.3d 106 (quotation marks omitted); *see also Warren*, 2005 ME 9, ¶¶ 21, 46-47, 866 A.2d 97.

### 1. Contribution to the Marital Estate

[¶26] Simpson first argues that in the referee's recommended property division, she failed to consider his contribution to the marital estate of the family home and $90,000 in cash, which were his nonmarital assets. Pursuant to 19-A M.R.S. § 953(1)(A), "[t]he contribution of each spouse to the acquisition of the marital property" must be considered when creating an equitable division of the marital estate.

[¶27] Contrary to Simpson's contentions, the referee adequately considered his contribution of nonmarital property to the marital estate. The referee found that before the marriage, Simpson had purchased what became the family home for $550,000 and that he conveyed the house to himself and Wechsler as joint tenants in 2011, when it was appraised at $690,000.[4] The referee also acknowledged that

---

[4] Simpson acknowledges, as he must, that because he conveyed the house to himself and Wechsler jointly during the marriage, he no longer owns a nonmarital interest in it, even though he purchased the house with separate funds before the marriage. *See Burrow v. Burrow*, 2014 ME 111, ¶ 14, 100 A.3d 1104 ("[W]hen real estate owned by one spouse before the marriage [is] placed into joint title

Simpson had $90,000 in cash when the parties married and that the entire amount had been spent during the course of the marriage.[5] Although the referee did not analyze these contributions in detail, her reference to the premarital value of the home and the consumption of the $90,000 in cash are sufficient to demonstrate that in her overall analysis, she considered Simpson's contribution of these assets.

[¶28] Similarly, the referee found that Wechsler's contributions toward the acquisition of marital property during the marriage exceeded Simpson's, which is a second way the referee acknowledged that Simpson had made a contribution. This finding was supported by competent evidence in the record, including Wechsler's testimony that she paid "the lion's share" of household expenses and Simpson's acknowledgement that he contributed less overall. The referee's recognitions of Simpson's contributions of his separate property to the marital estate, and her treatment of it when she recommended a property division to the court, do not constitute an abuse of discretion.

[¶29] Simpson further contends that in comparison to his interests, the referee gave more favorable treatment to Wechsler's contributions of nonmarital

---

by that spouse, the real estate [is] marital . . . ." (quotation marks omitted)). It is therefore clear that all of the equity in the house is marital in nature.

[5] Simpson does not argue that the use of his nonmarital cash to acquire property during the course of the marriage renders those items nonmarital, *see* Levy, *Maine Family Law* § 7.6[4][b][i] at 7-38 to 7-39 (8th ed. 2013), and in any event the record does not clearly reveal how that cash was spent. Rather, he argues that the division of the marital estate does not sufficiently account for the beneficial effect arising from the disposition of his nonmarital cash.

16

assets to the marital estate. Specifically, Simpson notes that the referee "careful[ly]" set apart the premarital portion of Wechsler's USAA savings account as her nonmarital property, but did not engage in the same analysis with respect to the marital residence or the $90,000 in cash that Simpson brought to the marriage. Wechsler, however, maintained the USAA savings account in her name throughout the marriage, and she further testified that while the parties were married the value of that account did not fall below its balance as of the date of the marriage. As a result, there was sufficient evidence for the referee to conclude that the premarital balance in the account was never converted into marital property.[6] *See* Levy, *Maine Family Law* § 7.6[2] at 7-28 to 7-30 (8th ed. 2013); *cf. Spooner v. Spooner*, 2004 ME 69, ¶ 29, 850 A.2d 354. By adopting this finding, the court was therefore required to set that portion of the account aside to Wechsler as her separate property. *See Long v. Long*, 1997 ME 171, ¶ 9, 697 A.2d 1317. In contrast, Simpson conveyed the house to himself and Wechsler as joint tenants, thereby transmuting the entire asset into marital property. *See Burrow v. Burrow*, 2014 ME 111, ¶ 14, 100 A.3d 1104. Simpson also concedes that $90,000 in cash

---

[6] The referee appropriately classified as marital property the entire increase in value of Wechsler's USAA savings account that accrued over the course of the marriage, *see* 19-A M.R.S. § 953(2)(E)(2)(b) (2015), and awarded Simpson $100,000 of that amount, whereas Wechsler only received approximately $64,000.

that he had before the marriage had been spent, leaving nothing for the referee to set aside to him as nonmarital property.

[¶30]  Therefore, the referee's categorizations of marital and nonmarital property do not suggest that the referee placed greater emphasis on Wechsler's contributions to the marital estate than Simpson's, and her analysis does not reveal error.

2.  Property Set Apart to Each Spouse and Economic Circumstances

[¶31]  Simpson argues that the referee's recommended property division was inequitable because she failed to account for the significant amount of the debt assigned to him.  Pursuant to 19-A M.R.S. § 953(1)(B)-(C), when creating a "just" division of marital property, a court, and therefore a referee, must consider "[t]he value of the property set apart to each spouse" and each spouse's "economic circumstances . . . at the time the division of property is to become effective."

[¶32]  Contrary to Simpson's contentions, the referee's recommended property division implemented her stated objective to award Simpson more than half of the value of the marital estate, even considering the debt assigned to him. The net value of the marital property awarded to Simpson exceeds $462,000.  In contrast, the value of the marital property allocated to Wechsler, although it did not include any debt, is less than $362,000.  Therefore, the property division was

actually favorable to Simpson by more than $100,000 and, under the circumstances in this case, was not unjust.

[¶33]   Simpson further argues that the referee failed to consider his individual "economic circumstances," *id.* § 953(1)(C), because he will be unable to make payments toward or refinance the $351,492 mortgage on the marital residence based on his imputed annual income of $30,000.  As the trial court observed, however, when it denied Simpson's objection to the referee's report, he has the option to sell the house—which is the most significant marital asset and was his to begin with—to gain "access [to] its significant equity."  The award of the house to him therefore did not place him in an untenable financial situation and does not represent an abuse of discretion.

[¶34]   Because the referee's findings were not clearly erroneous and addressed all factors relevant to the equitable distribution of the marital estate, the recommended property division was within the bounds of her discretion.

### III.  CONCLUSION

[¶35]   We conclude that contrary to Simpson's contentions, the referee's recommendation concerning the children's primary residence and the equitable division of the marital estate, which the court ultimately adopted in its final divorce judgment, arose from careful consideration of applicable statutory factors,

*see* 19-A M.R.S. §§ 953(1), 1653(3), and was not affected by error or any abuse of discretion.

The entry is:

Judgment affirmed.

—————————————

**On the briefs:**

Karen Frink Wolf, Esq., and Jonathan M. Dunitz, Esq., Verrill Dana, LLP, Portland, for appellant John P. Simpson

Margaret C. Lavoie, Esq., and Elizabeth J. Scheffee, Esq., Givertz, Scheffee & Lavoie, PA, Portland, for appellee Elena Wechsler

**At oral argument:**

Karen Frink Wolf, Esq., for appellant John P. Simpson

Margaret C. Lavoie, Esq., for appellee Elena Wechsler

Portland District Court docket number FM-2013-983
FOR CLERK REFERENCE ONLY