MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2016 ME 86
Docket:        Cum-15-459
Argued:        March 3, 2016
Decided:       June 7, 2016

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and
               HUMPHREY, JJ.

SELCUK KARAMANOGLU

v.

CATHERINE (KARAMANOGLU) GOURLAOUEN

HJELM, J.

[¶1]  Catherine Gourlaouen appeals, and Selcuk Karamanoglu cross-appeals, from a divorce judgment entered in the District Court (Portland, *Eggert, J.*) after it accepted and adopted the reports of a referee.  Gourlaouen challenges aspects of the judgment relating to parental rights and responsibilities, and to the determination of the parties' interests in properties located in Yarmouth and France.  In his cross-appeal, Karamanoglu alleges that he was not given proper credit for contributions he made toward the purchase of the France property. We affirm in part, vacate in part, and remand for further proceedings.

## I.  BACKGROUND

[¶2]  After Karamanoglu filed a complaint for divorce in February 2014 and with the agreement of the parties, the court (*Cadwallader, M.*) appointed a referee

to address all contested issues.  *See* 19-A M.R.S. § 252(1)(A) (2015); M.R. Civ. P. 53, 119.  The referee held bifurcated hearings on the parenting and financial issues, and then issued separate reports containing his findings of fact and recommended disposition of the contested issues.  The reports included the following facts, which bear on the issues on appeal, are based on competent evidence in the record, and were adopted by the court (*Eggert, J.*) in its divorce judgment.

[¶3]  The parties were married in Brest, France, in 2006.  They have one minor child, who was born in 2008.

[¶4]  In January 2014, Gourlaouen filed a complaint for protection from abuse against Karamanoglu.  After a contested hearing, the District Court (Portland, *Moskowitz, J.*) issued a protection order based on findings that Karamanoglu had abused Gourlaouen and the child.  Under the terms of the protection order, Karamanoglu was limited to supervised contact with the child. The child's therapist and the guardian ad litem, who was appointed during the divorce proceeding to represent the child's best interest, later agreed that it was in the child's best interest to have unsupervised visitation with Karamanoglu. Karamanoglu became engaged in counseling to learn to maintain a "strong and healthy relationship" with his son, and, as the referee found, was "strongly motivated to have a good and loving relationship with" him.  Based on evidence

that included the opinions of the child's therapist and the guardian ad litem, the referee found that Karamanoglu does not pose a risk of harm to the child and recommended shared parental rights and responsibilities, including shared primary residence and care.

[¶5]  The referee recommended that the parties be required "to participate in co-parenting counseling with a provider in private practice," who would engage "with the parents individually and, if she or he thinks appropriate, together."  The referee also recommended a requirement that the child continue counseling with a therapist but "shall not participate in mental health counseling with multiple providers simultaneously without the express[] knowledge and consent of [the child's therapist] and the co-parenting provider."  Additionally, the referee recommended a provision in the judgment requiring the parties to mediate any dispute regarding parenting issues before they could seek judicial recourse.

[¶6]  In a separate report, the referee addressed property issues.  The parties jointly own properties in Primelin, France; Freeport; and Yarmouth.  Two days before the parties married, they entered into a standard French marriage contract, which the parties agree is valid and enforceable, and provides that the division of property is governed by French law.  The contract includes a "separation-of-assets regime," which is commonly used in France.  Under the regime, each spouse's property rights are determined by his or her respective contributions to the

4

acquisition of the property rather than by title. Based on the contract and French law, the referee determined that there were several principles that were relevant to contested property division issues: that a spouse's initial payment to acquire real property is treated as a capital contribution and is recoverable by the payor spouse, even if the asset decreases in value; that loan payments made over the course of time, in contrast, are deemed to be "contribution[s] to ordinary marital expenses," and the equity resulting from those payments is presumptively divided equally between the spouses; and that any appreciation in the value of real property, which is called the *profit subsistant,* is allocated between the spouses in proportion to their financial interests as determined by their respective capital contributions and contributions to ordinary marital expenses.

[¶7] Karamanoglu and Gourlaouen supplemented the standard marriage contract with a clause stating that "the parties agree specifically that in the case of divorce, [Gourlaouen] will have to pay her husband a sum equivalent to half of the value of the buildings belonging to her at the time of divorce and acquired during the marriage." Because the only property that could be covered by this clause is the property that is located in Primelin, which was acquired in Gourlaouen's name six days after the marriage, the clause has been described in this proceeding as "the Primelin clause." Despite including it in the contract, both parties asserted to the referee that the Primelin clause was unenforceable because, as was explained

by each party's expert witness on French matrimonial law, its meaning is unclear. Karamanoglu paid $815,144 for Gourlaouen to acquire the Primelin property in her name alone. Gourlaouen did not contribute toward its purchase. The referee found that at the time of the hearing, its value was $500,000. The referee recommended that the Primelin property be set aside to Gourlaouen but that in the overall property division Karamanoglu be credited with half of the amount he paid when Gourlaouen acquired it.

[¶8] During the marriage, the parties bought the Yarmouth property for $4.3 million. Both parties made initial contributions toward the purchase price, although Karamanoglu's contribution exceeded Gourlaouen's. The referee treated these initial payments as separate capital contributions of the parties. The parties financed the balance of the purchase price through a loan from Karamanoglu's brother. During the marriage, the parties made payments toward the loan, which the referee treated as equal contributions by the parties to ordinary marital expenses rather than as additional capital contributions. By the time of the hearing, the value of the property had increased to $5 million. The referee quantified the amounts of the parties' separate interests in the property based on their respective initial capital contributions, and an attribution of the loan payments that is equal between the parties, with the resulting shares increased proportionally by the *profit subsistant*. Based on the referee's recommendation, the judgment

6

establishes Karamanoglu's and Gourlaouen's shares of the equity in the Yarmouth property to be approximately $3.1 million and $1.4 million respectively.

[¶9]  The referee recommended that the Yarmouth and Freeport properties should be set aside to Karamanoglu; that Gourlaouen be awarded the Primelin property; and that as an "equalization payment," Karamanoglu pay approximately $1 million to Gourlaouen.  The referee also recommended that Karamanoglu be required to pay Gourlaouen spousal support of $3,800 per month for five years.

[¶10]  Both parties filed objections to the referee's reports.  After holding a hearing, the court denied all objections, and adopted and incorporated the provisions of the referee's reports into a divorce judgment entered on August 28, 2015.  Gourlaouen's appeal and Karamanoglu's cross-appeal followed.

## II.  DISCUSSION

[¶11]  When—as it did here—a court accepts a referee's report and incorporates its findings and conclusions into the judgment, the findings of the referee become the trial court's findings, and we review those findings directly for clear error.  *Wechsler v. Simpson*, 2016 ME 21, ¶ 12, 131 A.3d 909.  Those "findings are entitled to very substantial deference" because of the referee's opportunity to observe and assess the witnesses' testimony.  *Id.* (quotation marks omitted).  We review the referee's recommendations regarding parental rights and property division for an abuse of discretion.  *Id.*  Finally, we engage in a de novo

review of the application of law to the facts. *Warren v. Warren*, 2005 ME 9, ¶ 20, 866 A.2d 97.

[¶12] We first address Gourlaouen's challenges to the portion of the judgment dealing with parental rights and responsibilities, and we then consider the parties' challenges to the property division.

A. Parental Rights and Responsibilities

[¶13] Gourlaouen asserts that the referee (1) erred by failing to impose conditions of contact between Karamanoglu and the child because of the history of abuse, *see* 19-A M.R.S. § 1653(6) (2015); (2) abused his discretion by requiring the parties to engage in joint counseling at the direction of a counselor, despite Karamanoglu's history of domestic abuse against Gourlaouen, *see* 19-A M.R.S. § 1653(6)(E); (3) abused his discretion by restricting the parties' right to make counseling decisions for their child; and (4) abused his discretion by requiring the parties to mediate future disputes about parenting issues before initiating legal proceedings.[1] We consider these contentions in turn.

1. Conditions of Contact Between Karamanoglu and the Child

[¶14] Gourlaouen first contends that the referee erred by failing to impose safety-related statutory conditions of contact in his report pursuant to 19-A M.R.S.

---

[1] Gourlaouen makes an additional argument that the referee exceeded his authority by recommending an amendment to the protection order that the court issued against Karamanoglu, so that his rights of contact provisions in that order would be consistent with comparable provisions of the divorce judgment. The court has since amended the protection order, and so the issue is now moot.

8

§ 1653(6), which applies to cases involving domestic abuse.[2] The judgment does not prescribe any conditions regulating Karamanoglu's contact with the child, and in fact, without restrictions or conditions, the judgment provides for shared primary physical residence and shared care of the child. The judgment does contain a requirement that Karamanoglu engage in co-parenting counseling, but for purposes of this analysis, we do not treat that condition as one that the referee deemed necessary for anyone's safety. With the resulting absence of any conditions governing contact between Karamanoglu and the child, Gourlaouen contends that the court erred by failing to comply with the statutory requirement.

[¶15] The introductory language of section 1653(6)[3] provides that when a court establishes rights of parent-child contact in cases—such as this one—

---

[2] Although Karamanoglu contends in his brief that Gourlaouen failed to preserve this issue on appeal, the record demonstrates otherwise.

[3] Title 19-A M.R.S. § 1653(6) (2015) provides:

**6. Conditions of parent-child contact in cases involving domestic abuse.** The court shall establish conditions of parent-child contact in cases involving domestic abuse as follows.

A. A court may award primary residence of a minor child or parent-child contact with a minor child to a parent who has committed domestic abuse only if the court finds that contact between the parent and child is in the best interest of the child and that adequate provision for the safety of the child and the parent who is a victim of domestic abuse can be made.

B. In an order of parental rights and responsibilities, a court may:

(1) Order an exchange of a child to occur in a protected setting;

(2) Order contact to be supervised by another person or agency;

involving domestic abuse, "[t]he court *shall* establish conditions" governing that

---

(3) Order the parent who has committed domestic abuse to attend and complete to the satisfaction of the court a domestic abuse intervention program or other designated counseling as a condition of the contact;

(4) Order either parent to abstain from possession or consumption of alcohol or controlled substances, or both, during the visitation and for 24 hours preceding the contact;

(5) Order the parent who has committed domestic abuse to pay a fee to defray the costs of supervised contact;

(6) Prohibit overnight parent-child contact; and

(7) Impose any other condition that is determined necessary to provide for the safety of the child, the victim of domestic abuse or any other family or household member.

C. The court may require security from the parent who has committed domestic abuse for the return and safety of the child.

D. The court may order the address of the child and the victim to be kept confidential.

E. The court may not order a victim of domestic abuse to attend counseling with the parent who has committed domestic abuse.

F. If a court allows a family or household member to supervise parent-child contact, the court shall establish conditions to be followed during that contact. Conditions include but are not limited to:

(1) Minimizing circumstances when the family of the parent who has committed domestic abuse would be supervising visits;

(2) Ensuring that contact does not damage the relationship with the parent with whom the child has primary physical residence;

(3) Ensuring the safety and well-being of the child; and

(4) Requiring that supervision is provided by a person who is physically and mentally capable of supervising a visit and who does not have a criminal history or history of abuse or neglect.

G. Fees set forth in this subsection incurred by the parent who has committed domestic abuse may not be considered as a mitigating factor reducing that parent's child support obligation.

contact. (Emphasis added.) Although the first sentence of section 1653(6) appears to be framed in mandatory terms, *see* 1 M.R.S. § 71(9-A) (2015) (stating that "'[s]hall' . . . indicate[s] a mandatory duty"), section 1653(6)(B), which is the specific basis for Gourlaouen's argument, lists conditions that "a court *may*" impose. (Emphasis added.) In contrast to the appearance of the word "shall," the Legislature's use of the word "may" signifies that a court merely has "authorization or permission" to impose conditions. 1 M.R.S. § 71(9-A).

[¶16] The overlap between the introductory language of section 1653(6) and the language of section 1653(6)(B) encompasses both a mandate and mere permission, and creates an ambiguity that requires resolution. "Statutory interpretation is a matter of law" that we review de novo. *Sunshine v. Brett*, 2014 ME 146, ¶ 13, 106 A.3d 1123 (quotation marks omitted). When interpreting provisions of a statute, we "examine the plain meaning of the statutory language" and "construe the whole statutory scheme of which the section at issue forms a part" to achieve a harmonious result, which is "presumably the intent of the Legislature." *Hickson v. Vescom Corp.*, 2014 ME 27, ¶ 15, 87 A.3d 704 (quotation marks omitted).

[¶17] The evident purpose of section 1653(6)(B) is to create a remedial mechanism to protect the safety of a child who has contact with an abusive parent, and also to protect the safety of others who have some involvement in that contact.

This is clear both from the nature of the conditions authorized in sections 1653(6)(B)(1)-(6), and from the specific language found in section 1653(6)(B)(7), which gives a court broad discretion to impose "any other condition" that it determines is necessary to provide for the safety of the child and others.

[¶18]  Here, in his findings the referee described the evolution of the nature of Karamanoglu's contact with the child after the protection order was issued against him.  The contact was initially supervised at a visitation facility, and then progressed to limited unsupervised contact and later to greater amounts of unsupervised contact.  The referee was presented with testimony from the child's therapist and the guardian ad litem that the child had not recently expressed being in fear of Karamanoglu, that the child looks forward to spending time with him and seemed comfortable with him, and that Karamanoglu is "strongly motivated to have a good and loving relationship with his son."  From this evidence, the referee explicitly found that Karamanoglu does not pose a threat to the child's safety or a risk to abscond with the child.

[¶19]  Based on these findings, which are supported by the record, the referee was entitled to determine that there was no need to impose conditions to protect the child.  This situation illustrates that there are instances where it becomes unnecessary for the court to prescribe conditions and limitations on parent-child contact in cases involving domestic abuse, because of, for example,

developments that have occurred since the parent engaged in abuse, rendering any such conditions unnecessary. We therefore construe section 1653(6)(B) in a way that does not mandate a court to impose conditions where the court is satisfied that contact is in the child's best interest, *see* 19-A M.R.S. § 1653(6)(A), and that no such conditions are needed to protect the child. This construction of section 1653(6)(B) gives full effect to the Legislature's use of the word "may" while interpreting that subsection in accordance with the legislative intent behind the entirety of section 1653, which is to give primary consideration to the best interest of children when addressing parental rights and responsibilities, *see* 19-A M.R.S. § 1653(1) (2015). *See Hickson*, 2014 ME 27, ¶ 15, 87 A.3d 704. Further, giving substantial deference to the referee's findings and conclusions, *see Pearson v. Wendell*, 2015 ME 136, ¶ 29, 125 A.3d 1149, we conclude that the referee did not abuse his discretion by declining to impose any such conditions here.

2. Co-Parenting Counseling

[¶20] In a related argument, Gourlaouen contends that the referee erred by failing to impose conditions on Karamanoglu's contact with *her* as provided in section 1653(6)(B) and, more specifically, that the referee erred by requiring her to engage in co-parenting counseling and giving the counselor authority to require the parties to participate in joint sessions.

[¶21]  Based on the referee's recommendation, the judgment provides:

> The parents are directed to participate in co-parenting counseling with a provider in private practice.  The provider shall work with the parents individually *and, if she or he thinks appropriate, together*.

(Emphasis added.)  Pursuant to 19-A M.R.S. § 1653(6)(E), however, "[t]he court may not order a victim of domestic abuse to attend counseling with a parent who has committed domestic abuse."  Because Karamanoglu has committed domestic abuse against Gourlaouen, this statutory provision foreclosed the court from requiring Gourlaouen to participate in joint counseling sessions with him.  We therefore vacate that aspect of the court-ordered counseling requirement.

[¶22]  Beyond this, Gourlaouen argues that the referee abused his discretion by not imposing other conditions that would apply, for example, during transfers of the child from one parent to the other, and that would protect her from Karamanoglu.  The referee found, however, that despite a history of abuse, Karamanoglu did not pose a risk of harm to her, and the referee did not order any conditions regulating Karamanoglu's contact with her.  The referee's findings and recommendations reveal a thoughtful appreciation of the effect that Karamanoglu's past conduct has had on her.  Nonetheless, the evidence also supports a finding that Karamanoglu does not pose a *present* threat to her and that there is not a legitimate basis to be concerned about his future conduct.  Therefore, the referee did not

abuse his discretion by declining to impose conditions that are authorized—but not required—by section 1653(6)(B).

      3.     The Child's Medical Treatment and Mental Health Counseling

[¶23]   Based on the referee's recommendation, the judgment delegates authority to third parties to approve or reject the parties' treatment decisions affecting their child's medical and mental health. With respect to medical issues, the judgment provides that the child "shall not be taken to providers besides his primary care physician or current counselor with the exception of emergency medical providers *unless such provider is recommended by the primary care physician, regular counselor* or the parties agree in writing." (Emphasis added.) The judgment also states that the child "shall not participate in mental health counseling with multiple providers simultaneously *without the express[] knowledge and consent of [the child's current counselor] and the co-parenting provider*." (Emphasis added.) Additionally, the judgment requires the parties to keep the child in counseling with the current counselor. Gourlaouen contends that the referee abused his discretion by making this recommendation, which the court adopted, because it infringes on her fundamental liberty interest to make parenting decisions for the child.

[¶24]  It is well established "that parents have a fundamental liberty interest to direct the care, custody, and control of their children." *Pitts v. Moore*,

2014 ME 59, ¶ 11, 90 A.3d 1169 (quotation marks omitted); *see also Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). As we stated in *Pitts*, the right to freedom from state interference with the parent-child relationship is not absolute, but intrusion by the state is permissible only if, on strict scrutiny, it is "narrowly tailored to serve a compelling state interest." 2014 ME 59, ¶ 12, 90 A.3d 1169 (quotation marks omitted). This, in turn, requires a showing that "there is some urgent reason or there are exceptional circumstances affecting the child that justify the intrusion." *Id.* (footnote omitted). Consequently, state intervention into a parent's liberty rights to care for a child is justified in order to prevent harm to the child or to ameliorate "harmful circumstances, such as a temporarily intolerable living situation." *Id.* ¶ 14 (quotation marks omitted).

[¶25] Here, the referee's findings make clear that both parties are fit parents. The referee recommended—and the court agreed—that the parties are to share parenting responsibilities, including shared primary residence and care of the child. As the referee concluded, although both parties "have their strengths and limitations, it is clearly in [the child's] interests [to] maintain a strong and substantial connection with each." These affirmative findings undermine any justification for depriving the parties of their right as parents to make decisions regarding medical and mental health intervention for their child.

[¶26] The judgment, however, does just that, because it requires the parents to obtain approval from third parties before they can take the child to non-emergent medical providers or to mental health providers in addition to the child's current counselor. Further, because the judgment requires the parties to continue the child's current therapy, it is the court that impermissibly interferes with the parties' right to parent.

[¶27] Although these parents and their child may have benefitted from the assistance of therapists and may continue to consult with appropriate professionals for guidance, mandating approval of experts is an intrusion into the parties' constitutionally protected right to make joint parenting decisions, and none of the requirements is supported by the very substantial showing necessary to justify it. We therefore vacate those portions of the judgment that either assign decision-making responsibilities concerning medical and mental health care to a third party or that directly require the parties to secure particular treatment for the child.

4.    Mandatory Mediation

[¶28] Gourlaouen challenges the provision of the judgment that requires the parties to mediate disputes about parental rights and responsibilities before either party may initiate a court proceeding on the dispute. As Gourlaouen acknowledges, she failed to properly preserve this issue because she did not

present the argument during the trial court proceedings. We therefore examine this aspect of the judgment for obvious error. *See Ackerman v. Yates*, 2004 ME 56, ¶ 20, 847 A.2d 418. "Obvious error is error that constitutes such a serious injustice that reversal is necessary because we could not in good conscience let the judgment stand." *Searles v. Fleetwood Homes of Pa., Inc.*, 2005 ME 94, ¶ 33, 878 A.2d 509 (quotation marks omitted).

[¶29] The challenged provision of the judgment provides:

> In the event that a dispute arises between the parties with respect to any provision in this Decision, *before commencing any action in [c]ourt*, the parties shall initiate and participate in mediation through . . . any . . . qualified mediator selected and agreed upon by the parties for the purpose of resolving the dispute. The mediation fee and any other related expenses will be shared equally between the parties.

(Emphasis added.)

[¶30] Because this requirement subordinates the parties' right to seek judicial recourse to an absolute requirement that they first participate in mediation, we must vacate this provision.

[¶31] By imposing mediation as a condition to the commencement of a post-judgment proceeding, the judgment materially frustrates the parties' right of access to the courts in three ways. First, it results in a pre-filing delay that, in certain circumstances—such as those that could affect the best interest or safety of a child—should not be accommodated. *See Ventrice v. Ventrice*, 26 N.E.3d 1128,

1132 (Mass. App. Ct. 2015) (vacating a provision requiring divorced parties to engage in mediation prior to filing any subsequent court action).

[¶32]   Second, particularly in a situation such as this where the parties' relationship had been marked by domestic abuse, a requirement of mandatory mediation could "discourage or even prevent one of the parties from seeking to modify the divorce judgment if a material change in circumstances or the best interests of the parties' . . . children so required." *Id.*

[¶33]   Third, the condition is contrary to the legislative scheme governing mediation in cases with minor children.   By statute, after initiating court proceedings, but before a contested hearing is held in certain types of domestic relations cases involving minor children, the parties must proceed to mediation. 19-A M.R.S. § 251(2) (2015).[4]   Despite that general requirement, the Legislature has recognized that there are instances where a party may be able to demonstrate "extraordinary cause" to dispense with that prerequisite, and upon such a showing, the court is authorized to waive mediation that is otherwise required.  19-A M.R.S. § 251(2)(B).  In contrast, the judgment here does not allow for any exceptions to mandatory pre-filing mediation, based even on circumstances that may now be completely unforeseen and unanticipated.  Nonetheless, the judgment forecloses

---

[4]   The Legislature recently enacted an amendment to this statute that has not yet taken effect. *See* P.L. 2015, ch. 296, §§ C-6, D-1 (effective July 1, 2016) (to be codified at 19-A M.R.S. § 251(2)).

either party from demonstrating to the court any reasons—based on "extraordinary cause" or otherwise—why it should dispense with mediation.

[¶34]  We fully recognize the salutary purposes and benefits of mediation in cases involving minor children.  *See* 19-A M.R.S. § 1653(1)(A) ("The Legislature finds and declares as public policy that encouraging mediated resolutions of disputes between parents is in the best interest of minor children."); *see generally* Levy, *Maine Family Law* § 5.1 at 5-1 to 5-3 (8th ed. 2013).  Seen in that context, the pre-filing mediation requirement included in the judgment represents a well-intentioned effort to give the parties a meaningful opportunity to resolve their parenting disputes in a cooperative and collaborative way.  Pursuant to section 251, the parties will have that opportunity if a post-judgment motion is filed.  Because, however, a requirement of *pre*-filing mediation could have an adverse effect on the parties' right to free and timely access to the courts, and because it undermines the statutory process for a waiver of mediation, we conclude that mandatory pre-filing mediation constitutes obvious error, and we vacate that provision of the judgment.

B.    Financial Issues and Property Division

[¶35]  Both parties argue that the referee erred as a matter of law in his application of the parties' French marriage contract and French law to the Primelin property.  Additionally, Gourlaouen contends that the referee erred with respect to the Yarmouth property.

1.      Primelin Property

[¶36]   The parties do not dispute that French law and the French marriage contract control the division of property.  In determining principles of foreign law, the trial court may consider testimony on the matter.  *See* M.R. Civ. P. 44A.  At the hearing on financial issues, the parties presented the testimony of two experts on French matrimonial law.  Both experts testified that the Primelin clause contained in the marriage contract is unenforceable, and the parties themselves asserted the same conclusion in their arguments to the referee.  As one of the experts explained, "[i]t is absolutely impossible to understand the intention of the parties . . . when entering such a contract and such a clause."  The experts also testified that the Primelin property should be divided according to the separation-of-assets regime that governs the other portions of the parties' marriage contract.  The referee found that under this framework, the spouse who paid the purchase price for an asset is entitled to recover that amount, even if the value of the asset subsequently decreased.

[¶37]   The referee found that during the marriage Karamanoglu paid $815,144 for Gourlaouen to acquire the Primelin property in her name.  Under the separation-of-assets regime, despite the potential conflict with the language of the parties' contract—which both parties agree is unenforceable—Gourlaouen is entitled to retain ownership of the property, but Karamanoglu is entitled to recover

the *entire* purchase price he paid, even though the value of the property decreased to $500,000.

[¶38]   Based on the referee's recommendation, the judgment provides that the Primelin property is set aside to Gourlaouen, and Karamanoglu is credited with $407,522, which is *half of the amount he paid* when Gourlaouen acquired it. Karamanoglu argues that under the separation-of-assets regime, he was thereby not given full credit for the proper amount.   For her part, Gourlaouen argues that Karamanoglu is entitled to half of the *value* of the property as of the date of the divorce.   As Gourlaouen acknowledged at oral argument, however, that contention is predicated on the very clause of the contract that she urged the referee *not* to implement because she asserted that it was unenforceable, and consequently this argument is not persuasive.

[¶39]   By crediting Karamanoglu with only half of the price he paid for the Primelin property, the referee failed to correctly apply French law to the parties' marriage contract, and we must vacate that part of the judgment.[5]

---

[5]   Gourlaouen makes the further argument that the referee used an incorrect exchange rate in calculating the amount due to Karamanoglu for his capital contribution.  Although any deviation between the rate the referee may have used ($1.2540/euro) and the amount that Gourlaouen claims was the actual rate at the time of the purchase ($1.2683/euro) does not appear to be material, we do not reach the issue because on remand the overall property division will be subject to the court's reconsideration.

2.      Yarmouth Property

[¶40]   Gourlaouen asserts that the referee erred in the division of the Yarmouth property, arguing that pursuant to French law the equity in that property should be divided equally rather than in a way that gives a larger share to Karamanoglu.  We disagree.

[¶41]   In his analysis of the parties' respective claims to the equity in the Yarmouth property, the referee carefully identified their differing initial "capital contributions" toward the down payment; the amount that was paid over time after they purchased the property, which the referee divided equally between the parties as equal "contributions toward ordinary expenses"; and the proportional enhancements to their shares attributable to appreciation—the *profit subsistant*. The referee's analysis was faithful to French law as explicated by the parties' experts, and his conclusions were not erroneous.

3.      Scope of Proceedings on Remand

[¶42]   Because of the error in the judgment affecting the role of the Primelin property in the overall division of the marital estate, we remand for the court to readdress that issue.   The elements of the property division, however, are interlocking, as is exemplified by the "equalization" payment that Karamanoglu must pay to Gourlaouen based on the overall award of marital assets and debts. Additionally, the determination of spousal support can be influenced by the

division of property. *See* 19-A M.R.S. § 951-A(5)(P)(1) (2015). Accordingly, we vacate all aspects of the property division and the award of spousal support so that on remand, the court may reconsider those issues to the extent they may be affected by its reconsideration of the issues regarding the Primelin property. *See Ehret v. Ehret*, 2016 ME 43, ¶ 18, --- A.3d ---.

## III. CONCLUSION

[¶43] In his proposed adjudication of disputed issues, the referee took a thoughtful and commendable approach in an effort to assist the parties to enhance their ability to serve their child as better parents. However, we must vacate the requirements in the judgment regarding co-parenting counseling, medical and mental health treatment of the child, and mandatory pre-filing mediation. Additionally, because the analysis of the parties' interests in the Primelin property was affected by error, we vacate the provisions of the judgment affecting property division and spousal support, and remand for reconsideration.

24

The entry is:

Section II(6) of the judgment is amended to delete any requirement that Gourlaouen attend counseling sessions with Karamanoglu. Sections II(7) and II(8) of the judgment are amended to delete the requirements that the parties obtain third-party approval before obtaining medical and mental health treatment for the minor child, and requiring the parties to obtain particular treatment for the child. Section VIII is vacated.

Sections IV-VII of the judgment are vacated. Remanded to the District Court for further proceedings on those issues.

**On the briefs:**

Brianne M. Martin, Esq., Powers & French, P.A., Freeport, for appellant Catherine Karamanoglu

Gene R. Libby, Esq., and Paige B. Streeter, Esq., Libby O'Brien Kingsley & Champion, LLC, Kennebunk, for cross-appellant Selcuk Karamanoglu

**At oral argument:**

Jonathan Davis, Esq., Powers & French, P.A., Freeport, for appellant Catherine Karamanoglu

Paige B. Streeter, Esq., for cross-appellant Selcuk Karamanoglu